56 F.3d 1087
 63 USLW 2792
 UNITED STATES of America, Plaintiff-Appellee,
v.
Maria Cecilia BARONA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Janet MARTINEZ, aka: Luz Janet Martinez & Luz Janeth
Martinez, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Brian BENNETT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mario ERNESTO Villabona-Alvarado, a/k/a Tico, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Dubarry McCARVER, a/k/a Mike Bald, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael HARRIS, a/k/a Tall Make, Defendant-Appellant.
 Nos. 90-50519, 90-50536, 90-50686, 90-50687, 90-50691 and 90-50694.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 5, 1994.
Decided June 5, 1995.
 
 Michael D. Abzug, Los Angeles, CA, for defendant-appellant Barona.
 Marlene Gerdts, Beverly Hills, CA, for defendant-appellant Martinez.
 David E. Kenner, Encino, CA, Alvin E. Entin, Entin, Schwartz & Margules, Miami, FL, for defendants-appellants Bennett and Harris.
 Donald M. Re, Los Angeles, CA, for defendant-appellant Villabona-Alvarado.
 Henry F. Reynolds, Santa Monica, CA, for defendant-appellant McCarver.
 Dean G. Dunlavey, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.
 Appeals from the United States District Court for the Central District of California.
 Before: WALLACE, Chief Judge, REINHARDT, Circuit Judge, and TANNER,* District Judge.
 Opinion by Chief Judge WALLACE; Concurrence by Judge TANNER; Dissent by Judge REINHARDT.
 WALLACE, Chief Judge:
 
 
 1
 Following extensive investigation, including wiretaps in foreign countries, the appellants were indicted and convicted of drug-related crimes. The district court had jurisdiction under 18 U.S.C. Sec. 3231. We have jurisdiction over this timely appeal pursuant to 18 U.S.C. Sec. 3742(a) and 28 U.S.C. Sec. 1291. We affirm in part, reverse in part, and remand.
 
 
 2
 * The issues we discuss arose in the context of a criminal prosecution of six individuals for an ongoing conspiracy to distribute cocaine. Mario Ernesto Villabona-Alvarado (Villabona) and Brian Bennett organized and supervised the operation. Cocaine from Colombia entered the United States through a source named "Oscar." The cocaine was then delivered by Maria Barona and Luz Janneth Martinez to Michael McCarver and Michael Harris for further distribution.
 
 
 3
 Several events led to the identification of this conspiracy and its participants. Between 1985 and 1987, the Drug Enforcement Administration (DEA) and the Los Angeles Police Department conducted a money-laundering investigation code-named "Operation Pisces." The result of this investigation was the arrest of Leonardo Gomez in Villabona's residence. Then in December 1987, Villabona and Bennett traveled to Copenhagen, Denmark, and registered at the Savoy Hotel. On December 7, 1987, Villabona, his wife (Helle Nielsen), and Bennett traveled to Aalborg, Denmark, to stay with Nielsen's parents. While in Aalborg, Villabona placed calls from the Nielsen residence and from a public telephone. On December 8, 1987, Villabona and Bennett returned to Copenhagen and stayed at the Hotel Sara-Dan. From Copenhagen, Villabona and Bennett flew to Milan, Italy, and registered at the Hilton International Hotel on December 9, 1987. In late March 1988, Villabona returned to Aalborg, Denmark, and again used the same public telephone. In each of these locations, the telephone calls made by Villabona were monitored by the Danish (or in one case, Italian) authorities. Tapes of these wiretaps were played for the jury and were relied on at least in part to convict Villabona, Bennett, Martinez, Barona, Harris, and McCarver.
 
 
 4
 Between March and November 1988, Bennett asked Stanley McCarns to transport 502 kilograms of cocaine from Los Angeles to Detroit and to return with millions of dollars. Stanley McCarns then arranged for Willie Childress and his cousin, James McCarns, to transport the cocaine. Childress and James McCarns were stopped en route on November 6, 1988, and a Missouri state trooper seized the cocaine. On November 11, 1988, domestic wiretaps commenced on two cellular telephones used by Villabona. These taps also resulted in the interception of several incriminating conversations.
 
 
 5
 A 28-count indictment resulted in the arrests of the six appellants. While we have disposed of the majority of the appellants' claims in an unpublished disposition, see Fed.R.App.P. 36; Ninth Cir.R. 36-1, two issues raised in this appeal require publication. See Ninth Cir.R. 36-2. The first of these issues, of concern to all of the appellants, is whether any or all of the wiretap evidence obtained in Denmark and Italy should have been suppressed. The second issue is whether count 27 charging Villabona and count 28 charging Bennett with running a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848, should be vacated because the jury may have impermissibly found that certain individuals counted as supervisees for purposes of section 848(c)(2)(A).
 
 II
 
 6
 The district court ruled on the motion to suppress the Denmark wiretap evidence as follows:
 
 
 7
 [T]he Court agrees with the Defense, that other than the Milan Wiretap, that these were wiretaps which were engaged in as a joint venture by the United States and Denmark.... [T]he Court finds that the order issued by the Danish Court was lawful and in accordance with their law.... The Court finds that the United States authorities reasonably relied upon the representations of the Danish officials with respect to the wiretaps, and therefore they were acting--in the Court's opinion--in good faith.
 
 
 8
 The question of whether the wiretaps were a joint venture requires the district court to "scrutinize the attendant facts." United States v. Rose, 570 F.2d 1358, 1362 (9th Cir.1978) (Rose ), quoting Byars v. United States, 273 U.S. 28, 32, 47 S.Ct. 248, 249, 71 L.Ed. 520 (1927). Therefore, we will not disturb such a finding unless it is clearly erroneous. We review de novo, however, the finding that the wiretaps were conducted in accordance with foreign law, United States v. Peterson, 812 F.2d 486, 490 (9th Cir.1987) (Peterson ), as well as the question of whether United States agents reasonably relied in good faith upon the foreign officials' representations that the wiretaps were legal under foreign law. See United States v. Mendonsa, 989 F.2d 366, 369 (9th Cir.1993) (issue of good faith reliance on domestic search warrant reviewed de novo).
 
 A.
 
 9
 When determining the validity of a foreign wiretap, we start with two general and undisputed propositions. The first is that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Secs. 2510-21, "has no extraterritorial force." Peterson, 812 F.2d at 492. Our analysis, then, is guided only by the applicable principles of constitutional law. The second proposition is that "[n]either our Fourth Amendment nor the judicially created exclusionary rule applies to acts of foreign officials." United States v. LaChapelle, 869 F.2d 488, 489 (9th Cir.1989), quoting United States v. Maher, 645 F.2d 780, 782 (9th Cir.1981).
 
 
 10
 Two "very limited exceptions" apply. Id. One exception, clearly inapplicable here, occurs "if the circumstances of the foreign search and seizure are so extreme that they 'shock the [judicial] conscience,' [so that] a federal appellate court in the exercise of its supervisory powers can require exclusion of the evidence." Id. at 490, quoting Rose, 570 F.2d at 1362 (further citations omitted). This type of exclusion is not based on our Fourth Amendment jurisprudence, but rather on the recognition that we may employ our supervisory powers when absolutely necessary to preserve the integrity of the criminal justice system. The wiretaps at issue cannot be said to shock the conscience. Even when no authorization for a foreign wiretap was secured in violation of the foreign law itself, we have not excluded the evidence under this rationale, Peterson, 812 F.2d at 491, nor should we. Here, the foreign courts were involved and purported to authorize the wiretaps. The conduct here, therefore, does not come close to requiring the invocation of this exception.
 
 
 11
 The second exception to the inapplicability of the exclusionary rule applies when "United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials." Id. at 490. If a joint venture is found to have existed, "the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable." Id.[1] If foreign law was not complied with, "the good faith exception to the exclusionary rule becomes part of the analysis." Id. at 492. "The good faith exception is grounded in the realization that the exclusionary rule does not function as a deterrent in cases in which the law enforcement officers acted on a reasonable belief that their conduct was legal." Id.
 
 
 12
 It is this exception that the appellants invoke, asking us to conclude (1) that the United States and foreign officials were engaged in a joint venture, (2) that a violation of foreign law occurred making the search unreasonable, and (3) that the United States did not rely in good faith upon the foreign officials' representations that their law was being complied with.
 
 B.
 
 13
 Because this exception is based solely on the Fourth Amendment, the appellants must first show that they are among the class of persons that the Fourth Amendment was meant to protect. In this case, three appellants, Martinez, Barona, and Villabona, are not United States citizens.
 
 
 14
 The Supreme Court has said, with regard to foreign searches involving aliens with "no voluntary connection" to the United States, that the Fourth Amendment is simply inapplicable. See United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75, 110 S.Ct. 1056, 1066, 108 L.Ed.2d 222 (1990) (Verdugo ). Verdugo reversed a decision of this circuit in which the panel majority found the Fourth Amendment applicable to a search of a Mexican citizen's Mexicali residence. See United States v. Verdugo-Urquidez, 856 F.2d 1214 (9th Cir.1988) (Verdugo-Urquidez ), rev'd, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). The Supreme Court rejected this court's "global view of [the Fourth Amendment's] applicability [which] would plunge [us] into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad." Verdugo, 494 U.S. at 274, 110 S.Ct. at 1065-66.
 
 
 15
 Unlike the Due Process Clause of the Fifth Amendment, which protects all "persons," the Fourth Amendment protects only "the People of the United States." Id. at 265, 110 S.Ct. at 1060-61 (explaining that the term "people" used in the Fourth Amendment was a term of art employed in selected parts of the Constitution to refer to "the People of the United States"). This term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." Id., citing United States ex rel. Turner v. Williams, 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904). The Fourth Amendment therefore protects a much narrower class of individuals than the Fifth Amendment.
 
 
 16
 Because our constitutional theory is premised in large measure on the conception that our Constitution is a "social contract," Verdugo-Urquidez, 856 F.2d at 1231-33, "the scope of an alien's rights depends intimately on the extent to which he has chosen to shoulder the burdens that citizens must bear." Id. at 1236; see also Verdugo, 494 U.S. at 272-73, 110 S.Ct. at 1065 (explaining that the Supreme Court has yet to decide whether the Fourth Amendment applies at all to illegal aliens in the United States). "Not until an alien has assumed the complete range of obligations that we impose on the citizenry may he be considered one of 'the people of the United States' entitled to the full panoply of rights guaranteed by our Constitution." Id.
 
 
 17
 The term "People of the United States" includes "American citizens at home and abroad" and lawful resident aliens within the borders of the United States "who are victims of actions taken in the United States by American officials." Verdugo-Urquidez, 856 F.2d at 1234 (Wallace, J., dissenting) (emphasis in original). It is yet to be decided, however, whether a resident alien has undertaken sufficient obligations of citizenship or has "otherwise developed sufficient connection with this country," Verdugo, 494 U.S. at 265, 110 S.Ct. at 1061, to be considered one of "the People of the United States" even when he or she steps outside the territorial borders of the United States.
 
 
 18
 It is not clear, therefore, that Villabona or the other non-citizen defendants in this case are entitled to receive any Fourth Amendment protection whatsoever. Any entitlement that they may have to invoke the Fourth Amendment in the context of an extraterritorial search is by no means clear. We could hold, therefore, that Barona, Martinez, and Villabona have failed to demonstrate that, at the time of the extraterritorial search, they were "People of the United States" entitled to receive the "full panoply of rights guaranteed by our Constitution." Verdugo-Urquidez, 856 F.2d at 1236. We choose, however, not to reach the question because even if they were entitled to invoke the Fourth Amendment, their effort would be unsuccessful.
 
 C.
 
 19
 Bennett, Harris, and McCarver are all United States citizens, and thus can invoke the protection of the Fourth Amendment generally. Our cases establishing the exception as to when the Fourth Amendment can be invoked in an extraterritorial search control our analysis.
 
 
 20
 First, the district court did not clearly err in finding that the four Danish wiretaps at issue were "joint ventures." In Peterson, we gave weight to the fact that the DEA "was involved daily in translating and decoding intercepted transmissions as well as advising the [foreign] authorities of their relevance." 812 F.2d at 490. Similarly here, the "American Embassy" was interested in the movement of Villabona and Bennett, American agents requested the wiretaps, information obtained was immediately forwarded to them, and throughout the surveillance a Spanish to English interpreter was provided by the United States.
 
 
 21
 Because there was a joint venture, we must decide whether the search was reasonable. In determining whether the search was reasonable, we must first consult the law of the relevant foreign countries. Id. at 491. The relevant provisions of Danish law are: (1) section 191 of the Danish Criminal Code (Code) and (2) sections 780-791 of the Danish Administration of Justice Act (Justice Act).
 
 
 22
 Justice Act Sec. 781(1) authorizes the intervention of secret communications, including the wiretapping of telephonic communications, if: (1) "weighty reasons" exist to assume messages are being conveyed via the medium in question, (2) the intervention is of decisive importance to the investigation, and (3) the investigation concerns an offense punishable by six or more years or is one of several other specifically enumerated offenses. Under Code Sec. 191(1), the drug offenses at issue here are punishable by six or more years, thus satisfying section 781(1)(3).
 
 
 23
 In addition to these three requirements under Justice Act Sec. 781(1), Danish law is somewhat more strict when it comes to monitoring conversations by use of a listening device or "bug" rather than by the tapping of telephone lines. Justice Act Sec. 781(4) allows the use of such devices to intercept communications only if the suspected offense involves "danger to the lives or welfare of human beings or considerable social assets." This latter section was relevant to the Danish Court in two of the surveillances because the government sought to use both a listening device and wiretaps. The section is not relevant to us, however, because it appears that no surveillance evidence, other than wiretap evidence, was used at trial. Even if such evidence were admitted, however, section 781(4) was followed.
 
 
 24
 Justice Act Sec. 783 outlines procedures to acquire a wiretap, section 784 provides for an attorney to be appointed for the target party, and section 788 provides for notification of the wiretap to the target party, unless the court omits or postpones such notification under section 788(4). After carefully reviewing the record, we are satisfied that Danish law was followed.
 
 1.
 
 25
 The first monitoring of communications occurred at the Savoy Hotel, Copenhagen, from December 4 to 7, 1987. The Danish police monitored communications both by tapping the hotel telephone lines, and by installing an electronic listening device in Villabona's room. In accordance with Danish law, the court held a hearing on December 5, 1987, at 10:00 a.m. to determine whether the wiretap and electronic eavesdropping, begun on December 4, 1987, was to be maintained. Justice Act Sec. 783(3) allows police to make the necessary intervention subject to court approval within 24 hours. The Danish court gave its approval based on information that Villabona, Nielsen (who is not a party in this appeal), and Bennett (the occupants of the room) were suspected of violations of Code Sec. 191, that they had transferred large amounts of money to Danish bank accounts, and that within a few days they had spent thousands of dollars on telephone calls. The Danish court concluded: "According to the available information, including, especially the transfers of money and the extent of the telephone bills, definite reasons exist to believe that the said telephone is being used to give information to, or from, a person suspected of violation of Penal Code Sec. 191." These findings satisfied Justice Act Secs. 781(1), (3), and the Danish court satisfied Justice Act Sec. 781(2) by determining that the monitoring was of definite importance to the investigation. The targeted parties had been appointed counsel according to Justice Act Sec. 784(1)(1)-(3). The court authorized the monitoring until December 11, 1987.
 
 2.
 
 26
 The second wiretaps were of the Nielsen residence and the public telephone, Aalborg, from December 7 to 9, 1987. On December 7, 1987, the court was notified that Villabona, Bennett, and Nielsen had made plans to travel to Aalborg. The Danish police then requested permission to monitor the telephone at Nielsen's residence in Aalborg, as well as authorization to install an electronic eavesdropping device in any hotel rooms they might move to, and to monitor any telephone calls from any such hotel rooms. The court granted the requested authorization until December 11, 1987.
 
 
 27
 After investigators observed Villabona making calls from the public telephone in Aalborg, Danish officials requested that the public telephone calls also be monitored. The Aalborg court allowed the monitoring of the public telephone calls until December 11, 1987. Again, the provisions of the Justice Act were followed. On December 18, 1987, the court, in accordance with Justice Act Sec. 788 found that Nielsen and the owner of the public telephone "should not be informed about the phone bugging undertaken, as disclosure would be damaging to the investigation of the case."
 
 3.
 
 28
 The third wiretap involved the Hotel Sara-Dan, Copenhagen, from December 8 to 9, 1987. On December 9, 1987, the Copenhagen Municipal Court was told that on December 8 a tap was placed on a telephone at the Hotel Sara-Dan. Villabona and Bennett had returned from Aalborg to Copenhagen so that they could fly to Milan on December 9, 1987. The court, in accordance with Justice Act Sec. 781, found that "definite reasons" existed to believe that the monitored communications contained information concerning suspected violations of Penal Code Sec. 191, and that the monitoring "must be considered of decisive importance for the investigation." The monitoring stopped on December 9 because Villabona, Bennett, and Nielsen left the hotel. As in the previous episodes, the court waived the "duty to notify" the targets in accordance with Justice Act Sec. 788(4).
 
 4.
 
 29
 The fourth tap involved the Nielsen residence and the public telephone, Aalborg, from March 28 to April 16, 1988. The Aalborg court was informed that Villabona and Nielsen were to return to Aalborg on March 28. Permission to tap the telephone at Nielsen's residence and the public telephone were sought. The Aalborg court found that based on Villabona's and Nielsen's last visit and telephone use, the tap was justified under the Justice Act. The tap was to expire on April 22, 1988, "with the provision that monitoring must be discontinued immediately if the defendants move."
 
 5.
 
 30
 A fifth wiretap occurred in Milan, Italy. On December 9, 1987, Villabona and Bennett arrived in Milan from Copenhagen. The day before, the Danish police notified a United States special agent of this planned trip. He, in turn, telephoned a United States special agent in Milan and requested physical surveillance. The latter agent contacted Major Rabiti of the Guardia Di Finanza and requested a watch on Villabona and Bennett. Rabiti obtained authorization to wiretap their hotel room.
 
 
 31
 The district court found that this wiretap was not the product of a joint venture between United States and Italian authorities. That a United States agent told Rabiti about Villabona and Bennett did not create a "joint venture" between the United States and Italy regarding this wiretap. See Stonehill v. United States, 405 F.2d 738, 741 (9th Cir.1968) (information provided to foreign official which led to search does not render investigation "joint"), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). We hold that the district court did not clearly err when it found no joint investigation surrounding the Milan wiretap, and, therefore, that Fourth Amendment principles do not apply. Peterson, 812 F.2d at 490. Because the wiretap was conducted by foreign officials without substantial United States involvement, the results are admissible.
 
 
 32
 In summary, the finding that the Milan wiretap was not a joint venture is not clearly erroneous. The finding that the Danish wiretaps were conducted pursuant to a joint venture is also not clearly erroneous, but Danish law was complied with for each Danish wiretap. None of the evidence from the wiretaps is therefore subject to exclusion under the Fourth Amendment.
 
 III
 
 33
 The second issue that we must resolve concerns only Villabona and Bennett. Counts 27 and 28 of the indictment charged Villabona and Bennett with being principal administrators, organizers, or leaders of a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848. According to section 848(c)(2)(A), the continuing series of violations that make up the continuing criminal enterprise must be undertaken "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management." The jury was told that it must find unanimously that a defendant charged with being a principal administrator, organizer or leader of a continuing criminal enterprise, must have, among other things, "occupied a position of organizer, supervisor or manager of the five or more persons." The jury found Villabona and Bennett guilty of running a continuing criminal enterprise. In accordance with section 848(b)(1), both were sentenced to life imprisonment.
 
 
 34
 To prove that Villabona and Bennett were principal administrators, the government did not merely present the jury with five persons it claimed were supervised by Villabona or Bennett. Rather, the government produced an extensive list of individuals, allowing the jury to pick those it felt met the definition of supervisee. The government named 12 possible supervisees of Villabona, and 8 people as potential supervisees of Bennett.
 
 
 35
 Among each list of supervisees was, the government concedes, at least one person who could not legally qualify as a supervisee under United States v. Delgado, 4 F.3d 780, 785 (9th Cir.1993) (Delgado ). Delgado establishes that "selling [drugs] to people does not make one an organizer of customers, even wholesale customers, any more than buying from them makes one an organizer of suppliers." Id. at 786. The terms "position of organizer" and "a supervisory position" that are found in section 848(c)(2)(A) must be read in the context of the whole provision, which states that the defendant must occupy "a position of organizer, a supervisory position, or any other position of management." 28 U.S.C. Sec. 848(c)(2)(A) (emphasis added). This means that an "organizer" or someone in a "supervisory position" must be in a position of management before the statute applies. "The syntax of the statute, 'A, B, or any other C,' implies that A must fall within the class C; that is, organizers are counted only if they exercise some sort of managerial responsibility." Delgado, 4 F.3d at 786.
 
 
 36
 The government argues that the convictions of Villabona and Bennett should stand because the evidence clearly supports a finding that at least five of the people were in the proper legal relationship of supervisee with respect to both Villabona and Bennett, and we should presume the jury chose the correct five because it was properly instructed on the law.
 
 
 37
 The jury was not instructed, however, that individuals qualify as supervisees only if they were those over whom Villabona or Bennett exercised managerial responsibility. It is true that the jury received an instruction that followed the language of section 848(c)(2)(A)--but our interpretation of that statute was not made clear until Delgado decided the issue, and Delgado was decided after the jury was instructed. If certain individuals were, as a matter of law, incapable of counting as supervisees, the jury needed to be instructed of this.
 
 
 38
 The problem in this case is not that the jury was presented with more than five individuals, or even that the jury may have chosen different people from the list of potential supervisees to fulfill the role. The problem is that, among the list of people who the jury was told that it could choose, there existed individuals that the jury was not allowed to choose as a matter of law.
 
 
 39
 The government's contention that we should presume that the jury picked the proper five supervisees has some initial appeal. It is an "almost invariable assumption of the law that jurors follow their instructions.... [We] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case ... and follow the instructions given them." United States v. Olano, --- U.S. ----, ----, 113 S.Ct. 1770, 1781, 123 L.Ed.2d 508 (1993) (citations omitted). But upon closer inspection, this reasoning cannot save the legal error that occurred here.
 
 
 40
 Griffin v. United States, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (Griffin ), illustrates the crucial difference between this case and other cases where we presume that the jury acted in accordance with the law. In Griffin, the defendant was convicted of a multiple-object drug conspiracy. The evidence connected Griffin to the first object of the conspiracy but not the second. Id. 502 U.S. at 47-48, 112 S.Ct. at 468. The jury returned a general verdict of guilty, and Griffin argued that "the general verdict could not stand because it left in doubt whether the jury had convicted her of conspiring to defraud the IRS, for which there was sufficient proof, or of conspiring to defraud the DEA, for which (as the Government concedes) there was not." Id. 502 U.S. at 48, 112 S.Ct. at 468.
 
 
 41
 The Court rejected this argument. After analyzing the historical practice of allowing a general verdict to stand so long as one count was sufficiently supported by the evidence, the Court examined the relevant caselaw, including Yates v. United States, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957), and Turner v. United States, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970) (Turner ). Yates involved a conspiracy consisting of two objects, one of which was insufficient as a matter of law to support the conspiracy conviction. The Court in Yates stated: "In these circumstances we think the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." 354 U.S. at 312, 77 S.Ct. at 1073 (citations omitted). Yates expanded prior law, holding that a general verdict must be set aside not only when one of the possible grounds for a conviction was unconstitutional, but also when one possible ground was legally impermissible. Griffin, 502 U.S. at 55-56, 112 S.Ct. at 472.
 
 
 42
 The Court in Griffin held Yates inapplicable to the situation before it. The Court explained that it had never "set aside a general verdict because one of the possible bases of conviction was neither unconstitutional ... nor even illegal as in Yates, but merely unsupported by sufficient evidence." Id. Instead, the Court relied on Turner, which held that "when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive ... the verdict stands if the evidence is sufficient with respect to any one of the acts charged." Id. 502 U.S. at 56-57, 112 S.Ct. at 473, quoting Turner, 396 U.S. at 420, 90 S.Ct. at 654. Because Griffin was charged with two objects of a conspiracy, so long as sufficient evidence of one object existed, the verdict could stand.
 
 
 43
 Explaining the difference between a conviction based on insufficient evidence, and a conviction based on a legally inadequate theory, Griffin illustrated why the line between Yates and Turner makes good sense.
 
 
 44
 Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law--whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence.
 
 
 45
 Id. 502 U.S. at 59-60, 112 S.Ct. at 474 (emphasis in original, citations omitted).
 
 
 46
 The distinction between Yates and Turner, made clear in Griffin, explains why the government's argument here must fail. Villabona and Bennett are not just contending that the evidence with respect to the list of supervisees is insufficient to support a finding by the jurors that five of them could not have played the requisite role. Rather, they are making the argument that certain persons on the list, given their role, could not have been supervisees of Villabona or Bennett as a matter of law. Based on Delgado, certain individuals could not be counted as supervisees, even if the jury made the precise factual findings that the government asked the jurors to make. The government concedes the point. Where the jury is presented with a legally inadequate theory, as opposed to a factually inadequate theory, Yates requires that the conviction be vacated and the case retried as to that charge.
 
 
 47
 Here, we cannot tell whether the jury selected one of the purported supervisees who was actually ineligible under Delgado. There were no instructions directing the jury to exclude one who is only a customer. Lacking some assurance that proper differentiation could be made, the verdicts on counts 27 and 28 must be reversed. Thus, we reverse Villabona's and Bennett's convictions for managing a continuing criminal enterprise in violation of 21 U.S.C. Sec. 848, and remand to the district court for a proper adjustment of their sentences and for retrial on the continuing criminal enterprise charges, should the government so choose.
 
 
 48
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 49
 TANNER, District Judge, concurring.
 
 
 50
 I concur in the opinion filed today. I write separately, however, to explicitly reject Judge Reinhardt's inference that the makeup of the panel affected the outcome of this case in any way other than in the normal course of the decision-making process that goes into every case heard before this court. Dissent at 1105 ("panel composition, not persuasive legal analysis, has determined the result in this case"). Nothing could be further from the truth.
 
 
 51
 REINHARDT, Circuit Judge, dissenting.
 
 
 52
 At a time when other branches of our government are more and more willing to eliminate the constitutional protections provided by the Fourth Amendment, courts should be especially zealous in their efforts to protect individuals from unlawful searches and seizures. See Murdock v. Stout, 54 F.3d 1437, 1444 (Noonan, J., dissenting). This precious constitutional guarantee has increasingly come under attack in recent years. Three months ago, the House of Representatives voted 303 to 121 to reject an amendment to the Crime Bill that consisted solely of the precise language of the Fourth Amendment.[1] Certain members of the legal academy are also joining the hue and cry to eliminate the exclusionary rule and to eviscerate the warrant requirement, see Akhil R. Amar, "Fourth Amendment First Principles," 107 Harv.L.Rev. 757 (1994), protections that its members once fought to establish and that are so necessary to the effective operation of the Fourth Amendment. It is precisely in times like these--when the constitutional rights of individuals are most threatened--that the courts should be vigilant in protecting them.
 
 
 53
 Instead, this court once again refuses to stand fast against the tide of public opinion and once again fails to act on behalf of the individuals whose rights we are sworn to protect. Once again in our zeal to conduct a war on drugs, the Constitution is the principal victim. Once again, we simply follow the pack instead of standing for constitutional principles.[2] Here, in a few, short, deceptively simple paragraphs, the majority has taken another substantial step toward the elimination of what was once a firmly established constitutional right--the right of American citizens to be free from unreasonable searches conducted by their own government.
 
 
 54
 This time, the majority holds that for all practical purposes the Fourth Amendment's protections do not extend beyond our borders, and that the only limitations on searches of Americans abroad are those imposed by foreign governments, even when our government initiates and participates in the search. Oddly, the majority reaches this erroneous and unfortunate result by first acknowledging what it must--that the Fourth Amendment is applicable to such searches. Opinion at 1094, 1095-1096. However, it then strips this important principle of all significance by holding that we must look exclusively to foreign law when determining whether the search violates the Fourth Amendment. According to the majority, our government's decision to initiate the search of an American citizen satisfies the requirements of that once powerful Amendment so long as the foreign officials who conduct the search comply with their own laws.[3] Thus, the majority opinion stands for the paradoxical rule that the Fourth Amendment applies to searches of American citizens in which United States agents play a substantial role but that probable cause, the most basic requirement of the Fourth Amendment, does not--except in the unlikely circumstance that the foreign land in which the search is conducted happens to have the identical requirements that our Constitution imposes.
 
 
 55
 The practical consequences of the majority's opinion can be simply stated. Without the probable cause requirement, the Fourth Amendment is without any real force. Searches of American citizens abroad can be instigated at the will of government agents. Any American traveling outside our nation's boundaries on vacation, business, or just visiting his family, is now fair game for wiretapping, surreptitious searches, and other invasions of privacy whenever members of the CIA, the DEA, the FBI, or who knows how many other alphabet law enforcement agencies, so desire.
 
 
 56
 Moreover, the majority's new rule is contrary to fundamental constitutional principles. The common-sense conclusion that a search of an American citizen cannot be instigated by the United States unless it has probable cause to do so is well-supported by existing caselaw, and there is no decision to the contrary. In fact, we need go no further than Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), and Stonehill v. United States, 405 F.2d 738 (9th Cir.1968), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969), to understand what is wrong with majority's opinion.
 
 
 57
 * * * * * *
 
 
 58
 It is clear, as the majority purports to recognize, that the Fourth Amendment applies to the search at issue. However, while acknowledging that the Fourth Amendment's protections extend to United States citizens abroad, the majority applies the Bill of Rights to foreign searches in a manner that leaves the search and seizure provision without force or effect. In doing so, the majority expressly rejects the noble vision of the Constitution articulated in Reid v. Covert, 354 U.S. 1, 5-6, 77 S.Ct. 1222, 1224-25, 1 L.Ed.2d 1148 (1957). In the words of the Reid plurality:
 
 
 59
 At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land. This is not a novel concept. To the contrary, it is as old as government.
 
 
 60
 Reid, 354 U.S. at 5-6, 77 S.Ct. at 1224-25 (plurality opinion).
 
 
 61
 Indeed, until today, the only circumstance in which we have held that the Fourth Amendment does not apply to a search of a United States citizen conducted abroad is when the United States is not involved in the search. Stonehill v. United States, 405 F.2d 738, 753 (9th Cir.1968), cert. denied, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). Stonehill explicitly held that the Fourth Amendment applies to a search by foreign officials when the participation of the United States government is sufficiently substantial to render a search or seizure a joint venture between the United States and the foreign government. Stonehill, 405 F.2d at 743. That is, as the majority correctly rules, the type of search involved here.
 
 
 62
 Recognizing that existing precedent compels the conclusion that the Fourth Amendment is applicable, the majority addresses the question whether the search at issue violated the requirements of the Amendment. Here it commits a fundamental error. It holds that in all cases involving joint-venture searches of Americans abroad the lawfulness of the search, for Fourth Amendment purposes, depends entirely upon the vagaries of foreign law.[4] Put simply, what the majority holds is that the only Fourth Amendment protections United States citizens who travel abroad enjoy vis-a-vis the United States government are those safeguards, if any, afforded by the laws of the foreign nations they visit. Under the majority's holding, the Fourth Amendment's requirements are wholly redundant since they provide nothing more than is already provided by foreign law. In fact, under the majority's rule, the Fourth Amendment provides even less protection than foreign law since, according to the principal case on which the majority relies, the Constitution does not even require foreign officials to comply with their own law; all that is required is that American officials have a good faith belief that they did so. See Peterson, 812 F.2d at 492. Thus, even though the majority concedes that the Fourth Amendment applies to joint-venture searches like the one before us, it holds that when Americans enter Iraq, Iran, Singapore, Kuwait, China, or other similarly inclined foreign lands, they can be treated by the United States government exactly the way those foreign nations treat their own citizens--at least for Fourth Amendment purposes.
 
 
 63
 The facts of this case exemplify the disastrous consequences of the majority's holding and the extent to which the opinion strips our citizens of fundamental safeguards against arbitrary invasions of their privacy by their own government. Here, the government does not contend that it had probable cause to obtain a court order permitting the interception of the phone calls of the defendants. Thus, had the defendants remained in this country, the government could not have tapped their telephones.[5] What the government did was to wait until they crossed the border. It then requested officials of another country, Denmark, which had at best an attenuated interest in the matter,[6] to act as agents for the United States and to tap the telephones of American citizens. By doing so, the government arbitrarily exercised its power over the defendants free of the constitutional constraints that the Bill of Rights imposes.[7] The majority's failure to require our government to have probable cause to initiate this search makes clear that its "application" of the Fourth Amendment to this case serves only to perpetuate a myth, if not a fraud, upon the public when it represents that the Fourth Amendment applies to Americans abroad and that it provides Americans with meaningful protection outside our borders. Certainly, that will no longer be the case if the majority opinion is allowed to stand.
 
 
 64
 * * * * * *
 
 
 65
 Probable cause is the fundamental requirement[8] that must be satisfied before our government can initiate searches in criminal investigations. See Camara v. Municipal Court, 387 U.S. 523, 535, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967) ("in a criminal investigation ... a search for [contraband] goods, even with a warrant, is 'reasonable' only when there is 'probable cause' " to conduct it). The majority has provided no reasonable explanation for its ruling that that requirement need not be met here, despite the Supreme Court's clear indication that it must do so in order to depart from the general rule that probable cause must exist for a search to be conducted. See, e.g., T.L.O., 469 U.S. at 341, 105 S.Ct. at 742; see also supra note 8. There is, of course, an obvious explanation for the majority's failure even to attempt to explain its departure in this case: there is simply no convincing justification that can be offered for abandoning the probable cause requirement with regard to foreign searches. While there may be good reason to abandon the warrant requirement abroad, there is no reason that, in a criminal case conducted in the United States, a federal judge cannot require a United States agent to explain after the fact why he initiated a search of one of our own citizens. Because judicial scrutiny of the search will always take place after it has been conducted, there is no conceivable way that imposing such a requirement would hinder law enforcement efforts abroad--except to the extent that those efforts violate our own Constitution.
 
 
 66
 One of the reasons that the majority errs so egregiously in this case is that it fails to recognize the difference between the questions whether there is enough reason to justify a search and what procedures must be followed thereafter. The difference is critical, and entirely different rules apply to the two inquiries. The reason for applying different rules is evident: the probable cause inquiry determines whether the United States has the right to request the search in the first place; that inquiry relates solely to a covenant between the United States and its people which has nothing to do with the foreign government involved. The foreign law inquiry, in contrast, determines essentially whether the foreign officials acted lawfully after they received a request to conduct a search--that is, whether they adhered to their own standards and practices in implementing the request of the United States.[9] The latter inquiry directly implicates the interests and concerns of the foreign nation involved.[10] Thus, the former inquiry, quite naturally, depends upon our law, while the latter is appropriately governed primarily by foreign law.
 
 
 67
 In place of reasoned analysis and a persuasive explanation for its decision, the majority relies wholly upon our decision in United States v. Peterson, 812 F.2d 486 (9th Cir.1987). Peterson, however, does not support the majority's conclusions. To the contrary, Peterson is entirely consistent with the view that the majority rejects--that the Fourth Amendment has independent force abroad and affords American citizens at least some substantial protections against intrusions by their own government. Peterson concerned the question whether the search was carried out properly by foreign officials, including the question whether a warrant should have been obtained, not the question of what standards should apply in determining whether the United States government lawfully requested the search in the first place.[11] Peterson never discusses the critical question of whether American officials must have probable cause for inducing a foreign government to carry out a search. In fact, there is no indication in the opinion that any such issue was ever raised before the court. Moreover, Peterson makes clear that when foreign law is relevant, it represents only one part of our inquiry into the constitutionality of the search. In the words of the court, when the United States undertakes a joint venture search with foreign officials, "the law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable." Peterson, 812 F.2d at 490 (emphasis added). In fact, the Peterson court repeatedly emphasized that the law of the foreign country represented only "part of the analysis." Id. at 492 (emphasis added); see also id. at 490 ("The law of the foreign country must be consulted ... as part of the determination."). Thus, the case upon which the majority so heavily relies in adopting its novel rule neither considers nor addresses the issue before us--whether probable cause is required for foreign searches; it does not, contrary to what the majority holds, state that we must look exclusively to foreign law; and, ironically, it is a case that the author of the majority opinion has previously conceded provides, at best, "implicit" support for his views. See United States v. Verdugo-Urquidez, 856 F.2d 1214, 1249 (9th Cir.1988) (Wallace, J., dissenting).[12]
 
 
 68
 * * * * * *
 
 
 69
 Next, I must express my strong disagreement with the method of legal analysis employed by the majority in this case. The majority, relying on Peterson, a case that does not even involve the question of probable cause,[13] reaches its decision as if the law in this area were well established and as if there were no arguments to be made in favor of the defendants' position. However, as the majority is well aware, in an earlier opinion authored by Judge Thompson, United States v. Verdugo-Urquidez, 856 F.2d 1214 (9th Cir.1988), the court held that the Fourth Amendment applies to searches conducted by a foreign government acting in conjunction with the United States and that when the United States participates in a foreign search probable cause must exist.
 
 
 70
 By contrast with the majority's opinion here, the Verdugo majority provided a well-reasoned and well-researched justification for its decision. It explored extensively the historical and legal basis for applying the Fourth Amendment to actions that our government undertakes in foreign lands. Although the Supreme Court reversed Judge Thompson's opinion on the ground that citizens of foreign nations are not entitled to Fourth Amendment protections during foreign searches, it left the part of the Verdugo analysis relevant to this case undisturbed. United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990). Specifically, the Court did not conclude that American citizens forfeit Fourth Amendment protections by going abroad; nor did it state that they are entitled only to the privileges afforded them by foreign law. There would in fact have been no reason for it to consider those questions.[14]
 
 
 71
 We have recognized that, even though a case has been vacated, as Verdugo subsequently was, United States v. Verdugo-Urquidez, 902 F.2d 773, 774 (9th Cir.1990), it still provides persuasive authority within the circuit if its reasoning is unaffected by the decision to vacate. See Orhorhaghe v. I.N.S., 38 F.3d 488, 493 n. 4 (9th Cir.1994). Such is, of course, the case with respect to the reasoning in Verdugo that is relevant here.
 
 
 72
 The majority deliberately ignores the reasoning in Verdugo that demonstrates the fallacy of its position. It offers no justification for concluding, contrary to Verdugo, that the probable cause requirement becomes "inoperative" when the government acts abroad, nor can it point to any development in the law that would require us to alter our Verdugo analysis. The majority's cavalier treatment of a well-reasoned explication by this court concerning the question before us suggests that panel composition, not persuasive legal analysis, has determined the result in this case. The government here was simply fortunate enough to draw a panel led by the dissenter in Verdugo and including another judge who agreed with his position.[15]
 
 
 73
 The government's good fortune is the nation's misfortune. The majority has improperly and severely limited one of the most important protections provided by our Constitution and has undermined one of its fundamental tenets. My colleagues' failure to address the persuasive authority of Verdugo only highlights the fact that they lack any reasonable or reasoned justification for their decision today.
 
 
 74
 * * * * * *
 
 
 75
 Early in this century, the Supreme Court warned that courts "must be vigilant to scrutinize the attendant facts [surrounding a search] with an eye to detect and a hand to prevent violations of the Constitution by circuitous and indirect methods." Byars v. United States, 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927). In our leading case involving foreign searches initiated by the United States government, this court warned that "[a] federal agent must not be permitted to do indirectly that which he cannot do directly, and thus circumvent the provisions of the Fourth Amendment against unreasonable search and seizure." Stonehill, 405 F.2d at 746. The majority's failure to heed these warnings ensures that when, as here, the United States government is unable to obtain a search warrant because it lacks probable cause, it can simply wait until a suspect goes abroad and then instruct a friendly or submissive foreign government to conduct the search on its behalf. Thus, the government is now free to conduct foreign searches in a manner that circumvents the requirements of the Constitution and to achieve indirectly what it cannot achieve directly. Even more important, the majority's decision drives one more nail in the coffin of the Fourth Amendment, and leaves all Americans with less protection against arbitrary governmental actions than they enjoyed before the majority spoke.
 
 
 76
 For these reasons, although I fully concur in Parts I and III of the opinion, I dissent from Part II.
 
 
 
 *
 Honorable Jack E. Tanner, United States District Judge, Western District of Washington, sitting by designation
 
 
 [1]
 Judge Reinhardt's worry that we look solely to the "vagaries of foreign law," dissent at 1100, and therefore strip "our citizens of fundamental safeguards against arbitrary invasions of their privacy," id. at 1101, is unfounded. Our discussion immediately preceding this paragraph clearly shows that where the circumstances of a search are so extreme as to shock the conscience, supervisory powers can be imposed to exclude the evidence. In addition, our citizens are protected by the full panoply of Fifth Amendment rights at trial
 Furthermore, Judge Reinhardt misreads Peterson when he argues that foreign law is "part of" the analysis--thereby inferring that there is some additional requirement, such as "probable cause," that must be satisfied. Read in context, Peterson makes it clear that the other part of the inquiry is whether the United States agents acted in good faith, even if foreign law was violated (as in Peterson ). Peterson, 812 F.2d at 491-92. But compliance with foreign law alone determines whether the search violated the Fourth Amendment. See id. at 491 ("local law of the Philippines governs whether the search was reasonable"). Peterson did not "repeatedly emphasize," dissent at 1104, any other point.
 In support of his contention that a foreign search must not only comply with applicable foreign law but must also be supported by probable cause, Judge Reinhardt relies heavily on certain language from Reid v. Covert, 354 U.S. 1, 5-6, 77 S.Ct. 1222, 1224-25, 1 L.Ed.2d 1148 (1957) (Reid ). See Dissent at 1100. Judge Reinhardt's reliance on Reid is erroneous. Judge Reinhardt fails to acknowledge that Reid 's "noble vision of the Constitution," id., would have been in a dissent were it not for the concurrences of Justices Frankfurter and Harlan, who "resolved the case on much narrower grounds than the plurality and declined even to hold that United States citizens were entitled to the full range of constitutional protections in all overseas criminal prosecutions." United States v. Verdugo-Urquidez, 494 U.S. 259, 270, 110 S.Ct. 1056, 1063, 108 L.Ed.2d 222 (1990) (Verdugo ). Thus, a majority of the Supreme Court in Reid rejected the view Judge Reinhardt endorses. Finally, just five years ago the Supreme Court unequivocally refused to conclude that Reid stands for the "sweeping proposition" ascribed to it by Judge Reinhardt. See Verdugo, 494 U.S. at 270, 110 S.Ct. at 1063 (Declining to interpret Reid as holding "that federal officials are constrained by the Fourth Amendment wherever and against whomever they act" and explaining that Reid decided only "that United States citizens stationed abroad could invoke the protection of the Fifth and Sixth Amendments.") (emphasis added); see also id. at 277-78, 110 S.Ct. at 1067 (Kennedy, J., concurring) (Adopting language from Justice Harlan's concurrence in Reid refusing to agree "with the suggestion that every provision of the Constitution must always be deemed automatically applicable to American citizens in every part of the world.").
 Undaunted and without citation, Judge Reinhardt opines that "[p]robable cause is the fundamental requirement that must be satisfied before our government can initiate searches in criminal investigations." Dissent at 1101-1102. In Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (Terry ), however, the Supreme Court rejected the principle that probable cause must support every search and seizure. Id. at 20, 88 S.Ct. at 1879. As the Court explained:
 If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether "probable cause" existed to justify the search and seizure which took place.... But we deal here with an entire rubric of police conduct ... which historically has not been, and as a practical matter could not be, subject to the warrant procedure. Instead, the conduct involved must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.
 Id. Like the search and seizure involved in Terry, foreign searches have neither been historically subject to the warrant procedure, nor could they be as a practical matter.
 Judge Reinhardt errs in failing to look to the text of the Fourth Amendment itself, and instead substitutes his words for those of the Framers. The Fourth Amendment provides:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or places to be seized.
 Upon reading the Fourth Amendment, one cannot help but realize two things. First, it is clear that the amendment contains two independent clauses. The first clause prohibits "unreasonable" searches and seizures. The second clause, the Warrant Clause, describes the procedures that must be followed in obtaining a warrant. The probable cause requirement is part of the procedures contained in the Warrant Clause. Yet nothing in the Fourth Amendment suggests that all searches or seizures must be conducted with a warrant and be supported by probable cause. Indeed, Terry and a long line of Supreme Court authority holds to the contrary. See Terry, 392 U.S. at 20, 88 S.Ct. at 1879; Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (search of probationer's home without warrant or probable cause allowed because regulation requiring reasonable grounds for search satisfied Fourth Amendment); O'Connor v. Ortega, 480 U.S. 709, 722-23, 107 S.Ct. 1492, 1500, 94 L.Ed.2d 714 (1987) (no warrant or probable cause required for search of public employee's office; search need only be reasonable); New Jersey v. T.L.O., 469 U.S. 325, 340-41, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985) (T.L.O.) (warrant and probable cause not necessary for search of school children for contraband); United States v. Martinez-Fuerte, 428 U.S. 543, 561-62, 96 S.Ct. 3074, 3084-85, 49 L.Ed.2d 1116 (1976) (authorizing stop of vehicles at fixed checkpoint away from the border with Mexico and brief questioning of occupants even in the absence of any individualized suspicion that the vehicle contains illegal aliens); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82, 95 S.Ct. 2574, 2580, 45 L.Ed.2d 607 (1975) (Border Patrol may stop vehicles briefly and ask occupants about their citizenship, immigration status, and any suspicious circumstances without warrant or probable cause if they have articulable suspicion); see also Camara v. Municipal Court, 387 U.S. 523, 534-35, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967) (housing code inspections may be made pursuant to area warrant not based on individualized probable cause). Reasonableness, not probable cause, is undoubtedly the touchstone of the Fourth Amendment. As the Supreme Court has explained, " 'probable cause' is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, ... in certain limited circumstances neither is required.' " T.L.O., 469 U.S. at 340, 105 S.Ct. at 742, quoting Almeida-Sanchez v. United States, 413 U.S. 266, 277, 93 S.Ct. 2535, 2541, 37 L.Ed.2d 596 (1973) (Powell, J., concurring).
 Judge Reinhardt suggests that even if a foreign search need not comply with the requirements of the Warrant Clause, such a search must nevertheless be supported by probable cause in order to be reasonable. Dissent at 1103 n. 9, quoting Verdugo, 494 U.S. at 279, 110 S.Ct. at 1068 (Blackmun, J., dissenting). At least five justices in Verdugo expressly rejected such a notion. Judge Reinhardt then chides us for not following our Verdugo panel opinion. Dissent at 1104-1105. We are bewildered by the attack. It was this Verdugo panel majority position that was rejected by the Court. The Court explained:
 [T]he Court of Appeals held that absent exigent circumstances, United States agents could not effect a "search or seizure" for law enforcement purposes in a foreign country without first obtaining a warrant--which would be a dead letter outside the United States--from a magistrate in this country. Even if no warrant were required, American agents would have to articulate specific facts giving them probable cause to undertake a search or seizure if they wished to comply with the Fourth Amendment as conceived by the Court of Appeals.
 Verdugo, 494 U.S. at 274, 110 S.Ct. at 1066 (emphasis added). Relying on the text of the amendment, its history, and prior Supreme Court cases concerning its extraterritorial application, the majority of the Court expressly rejected this view. See id.
 Although the reasoning of a vacated opinion may be looked to as persuasive authority if its reasoning is unaffected by the decision to vacate, the simple fact is that the Supreme Court categorically rejected the majority reasoning in Verdugo and instead adopted that of the dissent. See Verdugo, 494 U.S. 259, 110 S.Ct. 1056. Moreover, as indicated above, the Court expressly rejected the very conclusion--that a foreign search must be based on probable cause even if no warrant is required--that Judge Reinhardt thinks we should draw from our vacated panel opinion.
 Having ignored the text of the Fourth Amendment, the pertinent Supreme Court decisions, and Peterson 's rationale, Judge Reinhardt is forced to fall back on a vacated Ninth Circuit opinion, language from a plurality opinion which has subsequently been rejected by the Supreme Court, and language from a Supreme Court dissent as his "persuasive authority." Dissent at 1103 n. 9, 1104-1105. Perhaps this accounts for his editorial beginning, id. at 1098-99, and his strikingly strident comment that the "panel composition, not persuasive legal analysis, has determined the result in this case." Id. at 1105. We, of course, see it differently. This panel was properly composed. See Rules of the United States Court of Appeals for the Ninth Circuit, Introduction: Court Structure and Procedures at xx. Judge Reinhardt's conclusion that the result here "would indeed have been different," dissent at 1104-1105 n. 15, had the original Verdugo panel heard this case is wishful speculation. Unlike Judge Reinhardt, the judges on that panel may well have recognized that the Supreme Court rejected its original rationale and thus agreed that the result reached here is correct. We conclude our analysis is persuasive, based upon precedent and sound reasoning. We do not see those values in the dissent.
 
 
 [1]
 See Katherine Q. Seelye, "House Backs Bill to Require Restitution from Criminals," N.Y. Times, Feb. 8, 1995, at A16
 
 
 [2]
 Cf. Chew v. Gates, 27 F.3d 1432, 1450-51 (9th Cir.1994)
 
 
 [3]
 In fact, under the majority's view, even that is not necessary, since all that is required to uphold a search is a finding that our law enforcement officials believed in good faith that the foreign officials complied with their own law. See United States v. Peterson, 812 F.2d 486, 492 (9th Cir.1987)
 
 
 [4]
 The majority's effort to respond to this point, Opinion at 1091-1092 n. 1, is wholly unavailing. Rather than pointing to any Fourth Amendment protection its decision affords to American citizens abroad, the majority can only point to a protection afforded by the Fifth Amendment. See United States v. Verdugo-Urquidez, 856 F.2d 1214, 1245 (Wallace, J., dissenting) (an individual "may invoke the fifth amendment to challenge the admission of evidence that was obtained through means that 'shock the conscience'...."). In fact, by explaining that the courts can exercise their supervisory powers to prevent the United States from initiating a search that "shocks the conscience," the majority implicitly acknowledges that, under its view, the Fourth Amendment provides absolutely no protection to United States citizens traveling in foreign lands. Until this decision, the Fourth Amendment protected all citizens from intrusive searches and seizures initiated by our government without probable cause even when they did not shock the conscience. However, under the majority's view, American citizens traveling abroad no longer enjoy this important guarantee; the state can needlessly and arbitrarily subject American citizens to intrusive searches and seizures of every type without providing any justification for doing so as long as they do not rise to such an extreme as to shock the conscience. I note that the majority has not cited a single case in which a court has held that a search or seizure "shocks the conscience." But cf. Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). This is hardly surprising. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)
 
 
 [5]
 Actually, what is needed to obtain a court order for a domestic wiretap is far more than the probable cause mandated by the Fourth Amendment. See 18 U.S.C. Sec. 2518. However, for purposes of this dissent, it is necessary to consider only the government's failure to meet the probable cause standard
 
 
 [6]
 The search was conducted entirely at the behest of the United States government and entirely for the benefit of American agents. Denmark had no direct or substantial interest in tapping the defendants' telephones. To the contrary, the only information provided to its officials by the United States government made clear that the drug transactions in question were occurring thousands of miles away. Although in determining whether the telephones could be tapped the Danish court found that the defendants' conduct was punishable by up to six years in prison, there is no evidence that the Danish government ever intended to investigate the defendants for violations of Danish law, to prosecute the defendants for any violation of law, or to use the fruits of the wiretaps for either of those purposes
 
 
 [7]
 Denmark only requires that the government have "weighty reasons" to conclude that a search will produce evidence that those under investigation have engaged in a particular offense. Although we have no way of giving content to what is a meaningless phrase in our own legal system, it is clear from the facts of this case that the Danish standard falls far short of our own probable cause requirement
 
 
 [8]
 I had mistakenly believed that it was unnecessary to provide a citation for a contention as fundamental as that set forth in the text. However, the majority suggests that my failure to cite a case indicates that I alone subscribe to the belief that probable cause is a basic requirement of the Fourth Amendment. To the contrary, I merely follow the lead of the Supreme Court, which has repeatedly stated:
 In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution.
 Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970) (emphasis added); see also Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (same). Similarly, in New Jersey v. T.L.O., 469 U.S. 325, 340, 105 S.Ct. 733, 742, 83 L.Ed.2d 720 (1985), the case upon which the majority so heavily relies, the Court emphasized that "[o]rdinarily, a search ... must be based upon 'probable cause' to believe that a violation of the law has occurred." T.L.O., 469 U.S. at 340, 105 S.Ct. at 742.
 The majority is, of course, correct that in certain limited, narrowly defined cases, the Court has not required the government to have probable cause to conduct a search. In each of these cases, however, the Court both acknowledged that the Fourth Amendment generally requires probable cause to conduct a search and found unusual or exceptional circumstances which justified a departure from the general rule. See, e.g., T.L.O., 469 U.S. at 341, 105 S.Ct. at 742.
 Here, in contrast, as I have repeatedly pointed out in the text of my dissent, the majority has provided absolutely no justification for abandoning this basic requirement. It does not explain, for example, why the nature of a foreign search precludes us from applying the probable cause standard to such a search. While there may be good reason to dispense with the warrant requirement abroad, there appears to be no plausible justification--and the majority certainly has not provided one--for concluding that an American agent who requests that a search be conducted cannot be asked to explain the basis for his request at the time of the subsequent criminal proceeding in federal court. See infra text accompanying notes 8-9 (discussing this issue in greater detail). The obligation imposed on the government would be precisely the same as is imposed in the case of domestic searches.
 More important, the majority does not carve out a narrow exception to the general rule that the government must have probable cause to initiate a search of one of its own citizens. All of the cases cited by the majority concern narrow, carefully defined exceptions to the general probable cause requirement. For example, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), on which the majority so heavily relies, merely allows the police to conduct short, nonintrusive investigations without probable cause so long as they have a reasonable suspicion that the stop is necessary. Here, in sharp contrast, the majority has held that every foreign search, regardless of its level of intrusiveness or the circumstances surrounding the decision to initiate it, may be conducted without probable cause under the Fourth Amendment. Elementary respect for the dictates of the Fourth Amendment should preclude such an unwarranted extension.
 Finally, I must vigorously disagree with the majority's attempt to assert that the probable cause standard is part of the warrant requirement only and that the standard therefore need not be met whenever a warrant is not required. See Opinion at 1091-1092 n. 1. Both the Supreme Court and our circuit have often conditioned the admission of evidence obtained through a warrantless search upon the existence of probable cause for that search. See, e.g., California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); Hopkins v. City of Sierra Vista, 931 F.2d 524 (9th Cir.1991); United States v. Sarkissian, 841 F.2d 959 (9th Cir.1988). Indeed, the case upon which the majority relies, T.L.O., makes clear how revisionary and unprecedented is the majority's attempt to jettison the probable cause requirement with regard to all warrantless searches: "[o]rdinarily, a search--even one that may permissibly be carried out without a warrant--must be based upon 'probable cause'...." T.L.O., 469 U.S. at 340, 105 S.Ct. at 742 (emphasis added); see also id. (" 'the concept of probable cause ... bear[s] on the reasonableness of a search' "). I am in fact simply unable to comprehend how the majority can purport to separate the reasonableness requirement and the probable cause requirement in this case in light of the Supreme Court's explicit holding that "in a criminal investigation ... a search for [contraband] goods, even with a warrant, is 'reasonable' only when there is 'probable cause' to believe that they will be uncovered in a particular dwelling." Camara v. Municipal Court, 387 U.S. 523, 535, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967) (emphasis added); see also infra note 9 (quoting Justice Blackmun, who reaches the same conclusion).
 
 
 [9]
 The question of whether a warrant is required to conduct a joint-venture foreign search is determined by foreign law standards since it is intimately connected with the manner in which the search is carried out. As Justice Kennedy, the author of the Peterson opinion, observed:
 The absence of local judges or magistrates available to issue warrants, the differing and perhaps unascertainable conceptions of reasonableness and privacy that prevail abroad, and the need to cooperate with foreign officials all indicate that the Fourth Amendment's warrant requirement should not apply [abroad] as it does in this country.
 United States v. Verdugo, 494 U.S. 259, 278, 110 S.Ct. 1056, 1068, 108 L.Ed.2d 222 (Kennedy, J., concurring); see also id. at 279, 110 S.Ct. at 1068 (Stevens, J., concurring) (explaining that the warrant requirement is inapplicable abroad). Similarly, Justice Blackmun has observed:
 I agree with the Government ... that an American magistrate's lack of power to authorize a search abroad renders the Warrant Clause inapplicable to the search of a noncitizen's residence outside this country.
 The Fourth Amendment nevertheless requires that the search be "reasonable." And when the purpose of a search is the procurement of evidence for a criminal prosecution, we have consistently held that the search, to be reasonable, must be based upon probable cause.
 Id. at 297-98, 110 S.Ct. at 1078 (Blackmun, J., dissenting) (emphasis added). The use of the term "noncitizen" by Justice Blackmun was descriptive rather than limiting and is solely a consequence of the fact that the petitioner in that case was in fact a noncitizen. The four justices, other than Justice Kennedy, who formed the majority agreed that the warrant requirement is inapplicable for a somewhat different reason. They said that a warrant obtained in the United States would be a "dead letter" overseas. Verdugo, 494 U.S. at 275, 110 S.Ct. at 1066.
 
 
 [10]
 Moreover, from a practical standpoint, it would be most difficult to ensure that foreign police officials understood and followed our Fourth Amendment rules and procedure, and since we cannot in any event expect them to conduct searches involving our citizens in a different manner than they conduct searches of all other persons
 
 
 [11]
 As described in note 10, the Peterson author, Justice Kennedy, after joining the Court's decision in Verdugo, explained why the question of whether a warrant must be obtained falls in the first category of questions
 
 
 [12]
 The majority's continued adherence to its claim that Peterson compels the result in this case is quite surprising. The majority has apparently conceded, as it must, that Peterson does not address whether probable cause must exist for the United States to initiate a search of American citizens abroad. See Opinion at 1091-1092 n. 1. The majority cannot point to anything in Peterson that directly contradicts my interpretation of the decision, and the author of the majority opinion has already conceded that Peterson provides only indirect support for his contentions. See text supra. At best, the majority has suggested that there are at least two plausible readings of Peterson which support two entirely different results. In such a case, I believe that it is incumbent upon a court to acknowledge the lack of precedent for its holding and to provide cogent, developed reasoning for its conclusion; the parties deserve more than a few conclusory paragraphs accompanied by citations to a case that does not compel the result reached by the court
 
 
 [13]
 Indeed, Peterson 's only mention of the phrase "probable cause" takes place later in the opinion, when it discusses the defendants' arguments regarding an entirely separate search, one that took place on the high seas. Peterson, 812 F.2d at 493-94
 
 
 [14]
 The majority is plainly wrong when it contends that the Court "expressly rejected" the view that probable cause is necessary for a search of American citizens initiated by the United States. The sole support that the majority provides for this wholly unwarranted conclusion is a short passage in Verdugo that does nothing more than describe our own court's erroneous conclusion that the United States must obtain a warrant to conduct a search of a noncitizen in a foreign country. As is made clear from the Court's statement a few sentences earlier, this passage is only included to demonstrate that this circuit erred in ignoring "the problems attending the application of the Fourth Amendment to aliens." Verdugo, 494 U.S. at 274, 110 S.Ct. at 1066 (emphasis added). The passage solely concerns the Court's holding that the Fourth Amendment does not protect noncitizens from searches and seizures conducted by the United States abroad. The paragraph makes no mention of whether probable cause is required for searches of citizens. Thus, I simply cannot comprehend why the majority chooses to imply that, after devoting many pages to a detailed analysis of the Fourth Amendment's application to searches and seizures of noncitizens abroad, the Court would address the issue of the rights of American citizens in such an offhanded manner. Surely the majority does not believe that the Supreme Court would decide so important an issue without even acknowledging that it was doing so--particularly when that issue was entirely unnecessary to the resolution of the case before it
 More important, Justice Kennedy's concurring opinion in Verdugo makes it clear that the majority's contention that the Supreme Court rejected my approach and adopted Chief Judge Wallace's is simply wrong. In casting the fifth and decisive vote for the Verdugo opinion, Justice Kennedy explicitly observed that "[t]he rights of a citizen, as to whom the United States has continuing obligations, are not presented by this case." Verdugo, 494 U.S. at 278, 110 S.Ct. at 1068 (emphasis added); see also Verdugo, 494 U.S. at 279, 110 S.Ct. at 1068 (Stevens, J., concurring in the judgment) (concluding that the warrant requirement does not apply "to searches of noncitizens' homes in foreign jurisdictions" (emphasis added)). Given that the Court clearly never addressed the appropriate treatment of a Fourth Amendment claim by a citizen travelling abroad, I must most forcefully disagree with the majority's contention that the Verdugo decision forecloses the analysis I have afforded in my dissent.
 
 
 [15]
 By referring to panel composition, I do not of course question in any way the method used for selecting the panel. See Opinion at 1091-1092 n. 1 (citing the Rules of the United States Court of Appeals for the Ninth Circuit). Nor do I question the ability or legitimacy of either of my two esteemed colleagues. My reference to panel composition is plainly and simply a statement of an obvious fact. The result we reach here would indeed have been different if the panel that previously considered the question of foreign searches had been drawn to hear this case. Judges with different views or understandings of the Constitution regularly reach different results in cases presenting constitutional questions. That, however, is no excuse for failing to consider or discuss our earlier well-reasoned analysis. The explanation that the majority offers in its footnote replying to this dissent, see Opinion at 1091-1092 n. 1, is wholly unpersuasive. See supra note 14. In fact, the explanation serves only to confirm that there is no sound basis in law for the majority's failure to analyze the relevant legal authorities properly