Jack N. WHITAKER; Ramon Portillo, aka Candido Gutierrez–Elenes; Avelino Avalos; Eduardo Martinez; Virginia Delgado, aka Edna Cabrera; Ricardo Carrizoza, aka Vicente Lopez–Carrizoza; Lauro Rocha–Gaxiola; Antonio Rocha Gastelum, Plaintiffs,

v.

Gil GARCETTI, Curtis A. Hazell, David Demerjian, Jason Lustig, County of Los Angeles, Willie Williams, Dan Harden, Horacio Marco, Chuck Livingston, Keith Lewis, City of Los Angeles, Does One Through Ten, Defendants.

No. CV 99–8196WJR(CWX).

United States District Court, C.D. California.

Nov. 17, 2003.

Roger J. Rosen, Roger J. Rosen Law Offices, Los Angeles, CA, Philip A. De-Massa, Philip A. DeMassa Law Offices, San Diego, CA, for Plaintiffs.

Scott S. Widitor, Kemalyan & Richland, Richard S. Kemalyan, Jad T. Davis, Dwyer, Daly, Brotzen & Bruno, Cecil W. Marr, Cory M. Brente, Kim Rodgers Westhoff, Gary G. Geuss, Susan Kawala, Los Angeles City Attorney's Office, Los Angeles, CA, Felipa R. Richland, Richland & Associates, Beverly Hills, CA, for Defendants.

## OPINION AND ORDER

REA, District Judge.

Both Defendants and Plaintiffs have brought motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The matter came on for hearing before the Court, the Honorable William J. Rea, Judge, presiding, on October 1, 2003. Having considered the motions, the papers filed in support thereof and in opposition thereto, the oral argument of counsel, and the file in the case, the Court now makes the following decision.

## BACKGROUND

This action arises out of a dispute between Plaintiffs Jack Whitaker, Ramon Portillo, Avelino Avalos, Eduardo Martinez, Virgina Delgado, Ricardo Carrizoza, Lauro Rocha Gaxiola and Antonio Rocha Gastelum[1] and Defendants Gil Garcetti, Curtis Hazell, David Demerjian, Jason Lustig, the County of Los Angeles, Willie Williams, Dan Harden, Horacio Marco, Chuck Livingston, Keith Lewis and the City of Los Angeles.[2] Plaintiffs claim that their statutory and constitutional rights were violated by Defendants' unlawful electronic surveillances.

---

1. There are essentially three groups of Plaintiffs: (1) attorney Jack Whitaker ("Plaintiff Whitaker"), who was subjected to one telephone interception of an innocuous nature, and never charged with a crime; (2) Portillo, Avalos, Martinez, Delgado and Carrizoza (the "Portillo Plaintiffs"), who were jointly charged with and who unanimously pled guilty to felony narcotics distribution charges, in Los Angeles Superior Court case number BA 152147; and (3) Gaxiola and Gastelum ("Plaintiffs Gaxiola and Gastelum"), who were concurrently charged with and convicted of felony narcotics distribution charges, in Los Angeles Superior Court case numbers BA 132597 and BA 109547, respectively.

2. Garcetti is the former District Attorney for the County of Los Angeles; Hazell, Demerjian and Lustig are deputy district attorneys for the County of Los Angeles. Williams is the former Chief of the Los Angeles Police Department; Harden, Marco, Livingston and Lewis are supervisory officers of the Los Angeles Police Department's Narcotics Division, Major Violators Section. Collectively, Garcetti, Hazell, Demergian, Lustig and the County of Los Angeles are referred to as the "County Defendants." Likewise, Williams, Harden, Marco, Lewis, Livinston and the City of Los Angeles are referred to as the "City Defendants." All of these parties together are referred to as the "Defendants."

The events that gave birth to the instant dispute were two separate narcotics wiretap investigations conducted by the Los Angeles Police Department ("LAPD"). The first investigation revolved around Downey Communications ("Downey" and "the Downey wiretaps"), while the second revolved around the Atel Cellular and Pager Company ("Atel" and "the Atel wiretaps"). LAPD investigators supposedly suspected these companies of facilitating drug deals by providing cellular telephone and digital paging services to narcotics traffickers and money launderers. The Defendants then submitted to the Los Angeles Superior Court applications for wiretap orders, which included sworn affidavits in order to establish probable cause against Downey and Atel.[3] In relying on the sworn statements within the affidavits, the Superior Court issued wiretap orders for the Downey and Atel wiretaps.[4] Thus, the wiretaps were supposedly designed to further investigate the suspected criminal activity of Downey Communications and Atel Cellular and Pager Company, and their respective principals and employees.

More specifically, on November 7, 1994, County Defendant Gil Garcetti and City Defendant Willie Williams authorized an application for a wiretap order to intercept the communications of Downey. The Affidavit in Support of the Application for an Order Authorizing the Interception of Wire Communications, which was pre-pared by City Defendant Keith Lewis and presented to the Los Angeles Superior Court, alleged that:

> Downey Communications itself is involved in the trafficking of narcotics and/or laundering of drug proceeds. It is my expert opinion that Downey Communications is an operation to facilitate the sales of narcotics and the collection of U.S. currency which are the proceeds of narcotics sales. I believe that ENRIQUE NAVA [the owner of Downey] started Downey Communications to provide narcotics traffickers and money launderers assistance with phone service, and digital pager service."

Plaintiffs' First Am. Compl., Ex. 2 at 63. The affidavit additionally alleged that Mr. Nava "provides phones directly to narcotics dealers for their use during a period of active trafficking," *id.* at 50, and that Mr. Nava "and members of his organization act as brokers for the sale of narcotics in which they put buyers and sellers together." *Id.* at 59. The Los Angeles Superior Court granted the application to intercept nine telephone lines on November 8, 1994. Due to the numerous extensions of the wiretap order and expansions in the number of telephone lines tapped, Defendants intercepted over 30,000 conversations that took place across thirty Downey telephone lines for a duration of 11 months.[5, 6, 7]

Similarly, on May 21, 1996, County Defendant Garcetti and City Defendant

---

**3.** A "wiretap order" is an order giving law enforcement authorities judicial approval to conduct a wiretap. It basically is the wiretap equivalent of a search warrant but, due to its high potential for abuse, has more rigorous minimal standards than the typical search warrant. *See* Cal.Penal Code § 629.50 (1999)(listing the numerous and detailed specifications to be included in an application for a wiretap order); see also Cal.Penal Code § 629.52 (1999)(listing the many findings that a court is required to make before it issues a wiretap order, including but not limited to a finding of various different forms of probable cause).

**4.** Defendants received multiple extensions of the wiretap order, each of which, under the California Penal Code, could not "in any event [be] longer than 30 days." Cal.Penal Code § 629.58 (1999).

**5.** It seems worthwhile at this time to provide the durational provision of the California wiretapping statute, which is modeled after but more stringently than its federal equivalent, *see infra* pp. 1141–1142:

Williams authorized an application for a wiretap order to intercept the communications of John Lopez, Atil Nath and other principals and employees of Atel Cellular and Paging. The Affidavit in Support of the Application for an Order Authorizing the Interception of Wire Communications, prepared by County Defendant Jason Lustig, alleged that Atel was a " 'corrupt' cell phone retailer...whose role is to facilitate communication among large scale narcotics dealers by providing cellular phone, pagers, and other services in a manner which minimizes the risks to the dealer." Plaintiffs' First Am. Compl., Ex. 10 at 159. The Affidavit also alleged that the Atel principals and employees "were heavily involved in the sales and transportation of narcotics, as well as supplying cellular phones and pagers to narcotics dealers in order to facilitate their drug trafficking activities." *Id.* at 166. Moreover, it stated that John Lopez and Atil Nath, who are the owners of Atel, opened the business "to provide narcotics traffickers and money launderers assistance with secure, untraceable cellular phone services, and digital pager service."

*Id.* at 209. The Los Angeles Superior Court granted the application to intercept twenty-two telephone lines on May 21, 1996. Due to the myriad of extensions sought and obtained, Defendants were able to intercept dozens of thousands of conversations over the course of twenty-two months.

Unsurprisingly, the Downey and Atel wiretaps uncovered substantial criminal activity, although none on the part of any of the putatively targeted parties.[8] While intercepting calls pursuant to these broad and enduring wiretaps, Defendants became aware of suspicious conduct on the part of Plaintiffs, although none of the Plaintiffs were so much as named in the wiretap orders or under investigation by the LAPD at the time of the orders. In other words, Plaintiffs were mere clients of Downey or Atel, or merely involved in conversations with clients of Downey or Atel, but as a result of the two wiretaps, were indirectly subjected to electronic surveillance. These electronic surveillances served as the soil out of which the investigations against Plaintiffs originally grew.[9]

No order under this chapter shall authorize the interception of any wire, electronic pager, or electronic cellular telephone, or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than 30 days. Extensions of an order may be granted, but only upon application for an extension made in accordance with Section 629.50 and upon the court making findings required by Section 629.52. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event any longer than 30 days.
Section 629.58.

6. During a May 18, 1995 interception of a Downey telephone line, Defendants intercepted and overheard a conversation between attorney and Plaintiff Jack Whitaker and an agent of one of Whitaker's then-clients. While the conversation concerned the status

of the client's pending prosecution, Whitaker contends that the conversation was protected by the attorney-client privilege. Whitaker alleges that this interception violated both his state and federal rights. As seen *infra,* Whitaker's claims fail. It should be noted that every single Plaintiff, other than Whitaker, is a former criminal defendant who was wiretapped, then charged with and convicted of a felony.

7. The Los Angeles Superior Court has placed the contents of nearly all of these calls under seal.

8. *See infra* notes 22 & 24.

9. The Portillo Plaintiffs were ultimately discovered with 58 kilos of cocaine, while Plaintiffs Gaxiola and Gastelum were found with 190 kilos of cocaine. The approximate street value of the total cocaine recovered is over $25 million. *See* Transcript of October 1, 2003 Hearing ("Transcript") at 30.

Neither the Portillo Plaintiffs nor Plaintiffs Gaxiola and Gastelum were informed of the wiretaps to which they were subjected until long after their indictments, convictions and confinement.[10] The reason for this is very simple: the LAPD and the office of the Los Angeles District Attorney ("Office of the LADA") intentionally concealed the existence of the wiretaps from the Plaintiffs. More specifically, the LAPD and the Office of LADA utilized the "hand off" procedure. This procedure was designed to allow the Defendants to make use of the incriminating evidence derived from the wiretap, while at the same time, preventing the Plaintiffs from ever learning of the existence of the wiretap. The "hand off" procedure is the focal point of the instant case.

The wiretap "hand off" procedure appears to have first been used by the LAPD and the Office of the LADA in the mid–1980's. The logistics of the procedure are rather simple. An investigative unit applies for and obtains a wiretap order from a judge. Pursuant to the wiretap order, the investigative unit conducts electronic surveillance and gathers specific evidence of imminent criminal conduct. Rather than arriving at the scene and making arrests after observing the criminal conduct, the investigating unit transmits the information to another unit without expressly stating that the delivering unit obtained the information via a wiretap. The receiving unit is given both the specific information gathered through the wiretap and the critical instruction to "investigate" the conduct, which, in law enforcement code, see infra, signifies that the receiving unit should arrive at the crime scene and, rather than execute an arrest, observe the illicit conduct in order to obtain what law enforcement refers to as "independent" probable cause.

Upon acquiring this so-called "independent" probable cause, the receiving unit either makes an immediate arrest or obtains a search warrant on the sole basis of the so-called "independent" probable cause. The criminally accused is then prosecuted without ever knowing that he was subjected to the wiretap surveillance, as no mention of the wiretap is made in any police reports, through any discovery disclosures, or by any testifying detectives at hearings or at trial (the testifying detectives, non-coincidentally, belong to the receiving unit).[11][12] The conviction follows, yet the very existence of the wiretap is concealed from the criminally accused, in order to permit the survival of any pending investigations revolving around the wiretap.

With respect to the procedural and substantive constitutional rights of the accused, the LAPD and the Office of the LADA believe that the "hand off" drives an iron wedge between the pre-"hand off" wiretap and the post-"hand off" investigation, thus rendering the pre-"hand off" wiretap "uninvolved" in the ultimate prosecution and outside the realm of the accused's rightful knowledge. The accused is therefore never informed of or able to

10. The Portillo Plaintiffs pled guilty and Gaxiola and Gastelum were convicted after trial.

11. Because the testifying officers belong to the receiving unit and believe they obtained "independent" probable cause (since they were never expressly told of the wiretap, but see note 41), they do not reveal the existence of the wiretap in their declarations in support of the prosecution's opposition to the defendant's motion to suppress; nor do they make such disclosures when examined in court about the investigation.

12. The existence of the wiretap is concealed from the accused throughout the prosecution, whether the prosecution ends with a guilty plea, as in the case of the Portillo Plaintiffs, or with a guilty verdict, as in the case of Plaintiffs Gaxiola and Gastelum.

challenge the affidavit, the wiretap order, or the wiretap, itself (notwithstanding the fact that these are the investigative mechanisms out of which his prosecution originally arose).[13] Thus, the "hand off" procedure magically erases from the record the very existence of the wiretapping search, and the accused is prosecuted as if the search never occurred.

The record reveals the widespread instruction, knowledge, discussion, and use of the wiretap "hand off" procedure. Numerous declarations and in court testimonials from many of the instant Defendants (both detectives and district attorneys, alike) establish that the wiretap "hand off" procedure is specifically designed to obtain so-called "independent" probable cause after the initial wiretap in order to conceal the existence of the wiretap. Defendants speak freely and openly about the "hand off" procedure's express purpose of evading the revelation of the wiretap's existence. That they do not so much as hesitate in discussing its logistics, even while being cross-examined by defense counsel in criminal proceedings,[14] demonstrates their ultimate confidence in the legality and propriety of the procedure.

Plaintiffs have a different impression of the permissibility of the "hand off" proce-

dure. Accordingly, they have brought this lawsuit against Defendants, asserting four broad causes of action: (1) a section 1983 claim for judicial deception; (2) a section 1983 declaratory judgment claim for the per se unconstitutionality of the wiretapping "hand off" procedure; (3) a section 1983 money damages claim for the per se unconstitutionality of the wiretapping "hand off" procedure; and (4) numerous state law claims under the California Wiretapping Statute. Various motions and cross-motions for summary judgment are now before the Court.

For the reasons set forth below, the Court GRANTS, in part, and DENIES, in part, Defendants' Motions for Summary Judgment. The Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' § 1983 claim for judicial deception, under the principle of *Heck*. The Court denies Defendants' Motion for Summary Judgment and, instead, grants Plaintiffs' Motion for Summary Judgment with respect to Plaintiffs' § 1983 declaratory judgment claim for the per se unconstitutionality of the wiretapping "hand off" procedure. The Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' § 1983 money damages

---

**13.** Presumably, the typical criminal defendant who is investigated via a wiretap and ultimately prosecuted without mention of the wiretap is also the express target of the wiretap order. Because an investigation against the party is already in existence at the time of the wiretap (indeed, the investigation is precisely what generates the desire for and the probable cause underlying the wiretap), the wiretap merely serves to advance the pending investigation. The instant case poses an even greater danger: the criminal defendants (and now Plaintiffs) were neither identified in the wiretap order nor under investigation at the time of the wiretap. Thus, the wiretap did much more than merely advance a pending investigation; it single-handedly gave rise to the authorities' *awareness* of the Plaintiffs' illicit activities.

**14.** It should be noted that after receiving a Superior Court Order to provide notice to defendants and state prisoners whose lines were tapped but who were never so informed, *see infra* note 32, County Defendant (and District Attorney) Garcetti issued the following press release: "[s]ince 1993, our office has filed 85 cases in which wiretap surveillance techniques were utilized... The defendants in 58 cases were provided with *no information* concerning the wiretap surveillance while their cases were pending." *See* Complaint, Exhibit 22. The Superior Court Order lead to the instant Plaintiffs' realization that they were prosecuted and imprisoned without ever being informed that they were wiretapped. Plaintiffs subsequently brought this lawsuit.

claim for the per se unconstitutionality of the wiretapping "hand off" procedure, due to Defendants' entitlement to qualified immunity. Finally, the Court denies Defendants' Motion for Summary Judgment with respect to Plaintiffs' various state law claims under California Penal Code § 629, due to the existence of a genuine dispute of material fact on the issues of identification, minimization, and notice.

## DISCUSSION

### I. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a summary judgment motion should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).

A fact is material if, under the substantive law governing the case, it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Further, there is a "genuine" issue over such material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Factual disputes that are irrelevant or unnecessary under the relevant substantive law will not be considered. *Id.*

The burden of establishing that there is no genuine issue of material fact lies with the moving party. *Mutual Fund Investors v. Putnam Management Co.,* 553 F.2d 620, 624 (9th Cir.1977); *Doff v. Brunswick Corp.,* 372 F.2d 801, 805 (9th Cir.1966), *cert. denied,* 389 U.S. 820, 88 S.Ct. 39, 19 L.Ed.2d 71 (1967). To "defeat" such a burden, and survive a summary judgment motion, the responding party need only present evidence from which a jury might return a verdict in its favor. *See,* e.g., *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. More specifically, the "issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 248–49, 106 S.Ct. 2505. But the mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient as there must be evidence on which the jury could reasonably find for the respondent. *Id.* at 252, 106 S.Ct. 2505.

Because summary judgment is based on an inquiry of the facts, and their status as being material and undisputed, a summary judgment motion is appropriate "after adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Finally, the Court notes that "it is clear enough ... that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. In that regard, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)).

## II. Application to the Instant Case [15]

**(A) Plaintiffs' Claims Under 42 U.S.C. § 1983**

■ In order to establish a claim under Title 42 U.S.C. § 1983 (2003), a Plaintiff must show both: (1) that a person acting under color of state law committed the conduct at issue; and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States.[16] *See Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), overruled on other grounds; *Leer v. Murphy*, 844 F.2d 628 (9th Cir.1988). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *See Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994). Thus, in order to succeed on a § 1983 theory, Plaintiffs must demonstrate that Defendants violated Plaintiffs' rights under a specific constitutional or statutory provision.

**(1) Violation of Federal Statute**

Although rather unclearly, Plaintiffs assert a deprivation of their rights under the Federal Wiretapping Statute. 18 U.S.C. §§ 2510–20. Their apparent theory is that Defendants' failure to accord to the Federal Wiretapping Statute renders them liable to Plaintiffs pursuant to § 1983.[17] This claim is misguided because the wiretapping activities involved in this case are governed by the California statute and not the federal equivalent.

■ Because the Defendants are local rather than federal officials and municipalities, and because the two wiretapping statutes regulate the same sphere of conduct, the operative directive in our case is the California Wiretapping Statute and not the Federal Wiretapping Statute, unless of course, the federal statute preempts that of the state. *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. and Dev. Comm'n*, 461 U.S. 190, 212–213, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). It is accepted that Congress has the authority, in exercising its Article I powers, to preempt state law. *Id.* In the absence of an express statement by Congress that state law is preempted, there are two other bases for finding preemption. First, when Congress intends that federal law occupy a given field, state law in that field is preempted. *Pac. Gas* at 212–13, 103 S.Ct. 1713. Second, even if Congress has not occupied the field, state law is nevertheless preempted to the extent it actually conflicts with federal law; that is, when compliance with both state and federal law is impossible, *Florida*

---

**15.** The Court hereby takes judicial notice of the criminal court cases listed in County Defendants' request for judicial notice and the documents listed in City Defendants' request for judicial notice. As for the documents that are currently under seal by the state court, the Court takes judicial notice of their existence, but obviously cannot take judicial notice of their substance.

**16.** 42 U.S.C. § 1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**17.** Plaintiffs also assert, in Count III of their complaint, various state law claims against Defendants for violating Plaintiffs' rights under specific provisions of the California Wiretapping Statute. Cal.Penal Code § 629.50 et seq.

.. </>

**1142**

*Lime and Avocado Growers* at 142–43, 83 S.Ct. 1210, or when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ It is well accepted that Congress' wiretapping statute was not an attempt to occupy the field, but merely an attempt to establish minimum standards. *People v. Conklin* (1974) 12 Cal.3d 259, 271, 114 Cal.Rptr. 241, 522 P.2d 1049; *People v. Stevens,* 34 Cal.App.4th 56, 60, 40 Cal. Rptr.2d 92 (1995); 4 Witkin, Cal.Crim. Law 3d, § 338 (2000). Unsurprisingly, California's statute imposes more restrictive rules than its federal equivalent, *id.,* and is, therefore, not preempted. *Id.* Because of the absence of preemption and because Defendants are local officials who obtained the wiretap order from a local Superior Court Judge, Defendants were only bound by California's Wiretapping Statute.[18] Plaintiffs' sporadic references to violations of the Federal Wiretapping Statute are, accordingly, misplaced.[19] Plaintiffs are therefore barred from recovering under § 1983 for an underlying violation of federal statutory law. Thus, in order to succeed under § 1983, Plaintiff must establish an underlying constitutional violation.

**(2) Constitutional Violation**

Plaintiffs' attempt at establishing an underlying constitutional violation can be boiled down to two cognizable assertions: (1) Defendants violated Plaintiffs' Fourth Amendment rights by obtaining the wiretap order via judicial deception; and (2) Defendants' "hand-off" procedure in the context of wiretapping is per se unconstitutional, as it violates both the right to be free from unreasonable searches and seizures and the right to due process of law.[20] The Court shall now inspect each alleged violation individually.

**(a) Judicial Deception**

**(i) The Claim**

Plaintiffs contend that Defendants intercepted their calls without probable cause or lawful authority. Specifically, Plaintiffs allege that affidavits submitted in support of the wiretap applications falsely stated that the putative targets of the wiretaps, Downey Communications ("Downey") and Atel Cellular and Paging ("Atel"), were involved in narcotics trafficking and money laundering. Thus, Defendants' sworn testimony to the issuing judge that Downey and Atel were involved in the specific crimes articulated in the affidavit was a mere pretext to getting two broad wiretap orders that would inevitably reveal a plethora of illicit activities by other parties, who at the time of the wiretap application,

18. This is, of course, not to say that Defendants can freely violate the federal statute. Violations of the California statute would necessarily imply violations of the federal version, due to the latter's less stringent standards. Plaintiffs, however, cannot make out a cause of action against these Defendants by alleging specific violations of the federal law. Any allegations of failure to comply with specific statutory requirements must concern the California version.

19. The Court will therefore interpret Plaintiffs' claims of Defendants' failure to meet the requirements of identification, minimization and notice as state law claims.

20. It should be noted that Plaintiffs assert two separate § 1983 causes of action for the *second* alleged underlying constitutional violation (namely, the per se unconstitutionality of the wiretapping "hand off" procedure): Plaintiffs seek declaratory relief under one cause of action, and monetary damages under the other. As will be seen *infra,* the two causes of action ought to be resolved differently.

were entirely unknown. The real reason for the original wiretap orders, in other words, was not to investigate further Downey and Atel, but to uncover the unknown, illegal conduct of parties whose conversations and transactions would be detected by the broad wiretap order, and to commence criminal investigations against them.[21, 22]

■■■ A finding that the wiretap orders were procured through false and misleading statements would undermine the probable cause finding upon which the orders were based and would support a claim that Plaintiffs' Fourth and Fourteenth Amendment rights were violated.[23] *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (suppression is the appropriate remedy if magistrate issuing warrant was misled by information in affidavit that affiant knew was false or made in reckless disregard of the truth). While Defendants assert that this theory of judicial deception or false procurement is without merit, the record reveals that the wiretaps were extensively used to gain leads against unnamed parties, who were later charged with and convicted of crimes. Even after almost a year of extensions on the Downey wiretap order and two years of extensions on the Atel wiretap order, it appears that not so much as a formal investigation was commenced against any of the putatively targeted parties as a result of the wiretap.[24] Especially in light of the highly subjective element herein involved (i.e., the mental state of the affiant at the time of the wiretap application), a jury after proper witness testimony and cross-examination could reasonably find for Plaintiffs. *See Anderson, supra.* On these grounds, the issue ought not be disposed of at summary judgment.

(ii) The Defenses

The Supreme Court has established that qualified immunity is "an immunity from suit rather than a mere defense to liability." *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The question of whether a defendant is immunized should therefore be answered before trial, *Id.,* preferably at the summary judgment stage. *Act Up!/Portland v. Bagley,* 988 F.2d 868 (9th Cir.1993). The first step in evaluating a qualified immunity defense is to determine whether the plaintiff has shown that the action complained of constituted a violation of his or her constitutional rights. *Butler v. Elle,* 281 F.3d 1014, 1021 (9th Cir.2002); *Sonoda v. Cabrera,* 255 F.3d 1035, 1040 (9th Cir.2001).

21. Plaintiffs Gaxiola, Gastelum, Portillo, Avalos, Martinez, Delgado and Carrizoza are examples of such unknown parties whose criminal activities were readily detectible with the broad wiretap order.

22. As Plaintiffs point out, at no time were criminal charges brought against Downey and Atel, or their respective owners or principals. Additionally, there does not appear to be any record of a formal investigation commenced against these parties as a result of the wiretap.

23. Plaintiffs also claim Defendants' interception of calls violated Plaintiffs' rights to privacy under the First and Ninth Amendments. In the Ninth Circuit, the Ninth Amendment has not been interpreted as independently se-

curing any constitutional rights for the purposes of making out a constitutional violation. *Schowengerdt v. United States,* 944 F.2d 483, 490 (9th Cir.1991). The right to privacy in the context of electronic surveillance is protected by the Fourth Amendment. *Berger v. New York,* 388 U.S. 41, 53, 87 S.Ct. 1873, 1881, 18 L.Ed.2d 1040 (1967).

24. Counsel for the County Defendants alleged at the hearing that "one of the Navas was arrested and prosecuted, as far as I am aware." Transcript at 16. The numerous and voluminous papers filed by the County and City Defendants over the past four years, however, neither make such an assertion nor state the name of this alleged arrestee. Counsel's anonymous and undocumented verbal allegation does not suffice.

If the Court is satisfied that a constitutional violation occurred at the hands of a government official, the second step is to determine whether the violated right was clearly established, which is, in turn, evaluated on the basis of whether an objectively reasonable public official could have believed that the particular conduct at issue was lawful. *Id; Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Saucier v. Katz,* 533 U.S. 194, 194–95, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted"). Thus, a plaintiff seeking to undercut the defendant's asserted qualified immunity must first demonstrate that the defendant violated the plaintiff's constitutional right, and then demonstrate that the constitutional right was so established at the time of the violation that a reasonable official could not have believed that the particular conduct was legal.

Although these two inquiries are analytically distinguishable, *Saucier,* 533 U.S. at 194, 121 S.Ct. 2151, in the particular scenario in which a plaintiff is asserting judicial deception in procuring a warrant, the two inquiries merge into one, since "no reasonable officer could believe that it is constitutional to act dishonestly or recklessly with regard to the basis for probable cause in seeking a warrant." *Butler,* 281 F.3d at 1024. Thus, in judicial deception cases, should the factfinder find against

the official on the state of mind question, qualified immunity would not be available as a defense. On the other hand, should the fact-finder find at trial in the official's favor, that is, that he did not act dishonestly or recklessly, then the officer's conduct would not have violated any clearly established statutory or constitutional rights. *Id.* Simply put, if the official "was reckless or deceitful in preparing the warrant affidavit, then he both violated [plaintiff's] rights and is not entitled to qualified immunity." *Id.* This Court must postpone answering the qualified immunity question, since the answer will be conclusively established by the jury's factual determination of the state of mind issue.

■ Unfortunately for Plaintiffs, the Supreme Court has established that a state prisoner is barred from pursuing a claim for money damages under § 1983 if a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence, unless the prisoner can demonstrate that the conviction or sentence has already been invalidated. *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). A finding by the jury that the wiretap orders were procured by way of false and misleading statements would have the effect of undermining the legality of the wiretap and tainting fatally Plaintiffs' convictions in state court.[25] In other words, a jury finding on the judicial deception issue in favor of Plaintiffs would necessarily imply the reversal of Plaintiffs' earlier convictions.[26, 27]

---

**25.** This is so because the attenuation between the wiretap and the post-"hand off" investigation was insufficient, assuming taint, to dissipate the taint of the wiretap, *Nardone v. U.S.,* 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). *See* analysis, *infra.*

**26.** Ironically, if the Court were to accept Defendants' argument that the "hand off" creates *"independent"* probable cause, *see infra,* Defendants' *Heck* defense to the judicial deception claim would unravel, since Defen-

dants contend *infra* that the probable cause derived from the investigation after the "hand off" is sufficiently attenuated from the original wiretap so as to be denominated "independent." Defendants' motions, incidentally, overlook this rather critical paradox and, instead, argue inconsistently that Plaintiffs' convictions, due to the "hand off," were not derived from the wiretap, on the one hand, and that Defendants are entitled to a *Heck* defense, on the other. Because Defendants' two arguments are mutually exclusive, they

For this reason, Plaintiffs are barred from pursuing their claim for money damages under § 1983 on a judicial deception theory. Defendants' motion for summary judgment on this claim is therefore granted.

(b) Unconstitutionality Of The Wiretap "Hand Off" Procedure

(i) The Claim

Plaintiffs argue that the wiretap "hand off" procedure is a per se violation of the United States Constitution. More specifically, Plaintiffs contend that the wiretap "hand off" procedure offends the right to be free from unreasonable searches and seizures under the Fourth Amendment and the right to due process of law under the Fourteenth Amendment.[28, 29]

Remarkably, the issue of whether such a procedure is constitutionally permissible seems to have never been decided. County Defendants' Opposition to Plaintiffs' Motion for Summary Judgment states that "[t]he hand off technique was judicially approved as a law enforcement investigation technique by the Ninth Circuit," citing *United States v. Barona*, 56 F.3d 1087 (9th Cir.1995). County Defendants also cite *People v. Levine*, 152 Cal.App.3d 1058, 199 Cal.Rptr. 756 (1984), to support the proposition that the "hand off" procedure has been judicially accepted.

County Defendants badly misread these cases. *Barona* involved Danish wiretaps that were *directly* relied upon by the prosecution and played before the jury to establish guilt. *Id.* at 1090. *Levine* involved the non-disclosure of the identity of a confidential informant whose sworn testimony was *directly* used to establish probable cause for the purpose of obtaining a search warrant. In both cases, the prosecutor directly relied on the evidence being challenged and the defendants knew the source of the evidence being used against them. In *Barona*, Defendants knew of the existence of the wiretap; indeed, tapes of the wiretap were played in front of them and the jury at trial. In *Levine*, the De-

---

collectively amount to an impermissible attempt at having their cake and eating it too.

27. Lastly, the Court is not inclined at this time to carve out a "belated discovery" exception to the *Heck* rule, as Plaintiffs do not appear to have properly requested the creation of such an exception. However, the Court notes that such an exception appears necessary in situations where § 1983 plaintiffs (who are former criminal defendants) failed to suppress on judicial deception grounds solely due to their ignorance of the wiretap (and the corresponding wiretap order and underlying affidavit) in the first place. A criminal defendant can hardly be blamed (and precluded from later recovering under § 1983) for not moving to suppress for judicial deception when the very involvement of a judge, affidavit, wiretap order and wiretap were purposefully and successfully concealed from him during his criminal proceeding.

28. It should once again be mentioned that Plaintiffs assert two separate § 1983 claims triggered by this particular alleged constitu-

tional violation: (1) a claim for declaratory relief, and (2) a claim for monetary damages. Because the two claims do not necessarily entail the same result, the Court shall analyze each claim separately, beginning with the request for declaratory relief.

29. It should also be recalled that Plaintiffs' § 1983 claim for injunctive relief was dismissed for lack of standing at the 12(b)(6) stage, pursuant to the doctrine of *Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("[t]he equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury"). *See* Court Order, entered April 13, 2000. Plaintiffs' § 1983 claim for declaratory relief, which was derived from Plaintiffs' original request for "other relief that this Court deem (*sic* ) just and proper," *see* Plaintiffs' 2d. Am. Complt., is unaffected by *Lyons* and remains a valid claim at this time.

fendants not only knew of the existence of the confidential informant, but knew the content of the informant's testimony. The identity of the confidential informant was the only information concealed. The wiretap "hand off" procedure, on the other hand, conceals the very *existence* of the wiretap so that the accused never even learns that the wiretap occurred in the first place. The two cases cited by County Defendants have nothing to do with the "hand off" procedure.

■ The numerous briefs submitted by the parties and the rather diligent independent search performed by the Court leaves the Court with the belief that the constitutional issue presented in this case is an issue of first impression. The constitutional question before the Court can be framed either narrowly or broadly. The narrow framing of the issue is as follows: does the wiretapping "hand off" procedure, which is designed to obtain so-called "independent" probable cause and, in turn, conceal the existence of the wiretap, violate the constitutional rights of the criminal defendant? The broader framing of the issue is the following: does a criminal defendant have a constitutional right to know that he has been subjected to a Fourth Amendment search from which the investigation against him originally arose? [30, 31] The Court answers both questions in the affirmative and declares the instant wiretapping "hand off" procedure *per se* unconstitutional.

Due to the precedently vacuous realm in which the Court now enters, the traditional cookie-cutter method of legal analysis is an obvious impossibility. A clear statement of the controlling doctrine and its various exceptions, followed by an application to the specific facts of this case, will not transpire. Instead, a more open-ended quest is in order, drawing on various related but uncontrolling doctrines, removing from each doctrine its quintessential assumptions, principles, and resolutions, and, ultimately, transplanting these gems into the issue before the Court in order to arrive at the proper holding.

Accordingly, the Court believes that (1) the preservation of the substance of the Fourth Amendment, (2) an analysis of the specified safeguards of the Federal Wiretapping Statute, and (3) a proper understanding of the notion of "independence" all promote a common holding, namely, the

---

**30.** That this question has apparently never been addressed in our Circuit or by the United States Supreme Court is truly bewildering. The time has come to answer this severely overdue yet fundamental constitutional question.

**31.** The established investigative procedures that make use of confidential informants or undercover agents certainly contain an element of secrecy, in that the identities of these parties are concealed by the government in prosecuting the case. Such concealment occurs not only to allow for the continuation of the secret investigation, but also to protect the parties and their families from retaliation or harm. *See People v. Hobbs,* 7 Cal.4th 948, 958, 30 Cal.Rptr.2d 651, 873 P.2d 1246 (1994). Importantly, if the accused can make a showing that disclosure of the informant's identity is "relevant and helpful" to his de-

fense, such information must be revealed. *Roviaro v. United States,* 353 U.S. 53, 60, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *Lopez–Hernandez v. United States,* 394 F.2d 820, 821 (9th Cir.1968). Thus, the concealment involved in confidential informant cases is (1) limited to the identity of the informant (rather than extending to the existence of the informant or the content of the informant's revelations), (2) known to the accused, and (3) *rebuttable* by the accused upon a proper showing. The "hand off," on the other hand, involves the concealment of the *entire wiretap search,* thereby rendering the concealment *de facto* unrebuttable, since a criminal defendant can hardly rebut the propriety of the government's concealment when the concealment is, itself, unknown to the defendant. *See infra.* The form of concealment resulting from the "hand off" procedure is, therefore, entirely distinguishable.

*per se* unconstitutionality of the wiretapping "hand off" procedure.[32]

*Preserving The Substance Of The Fourth Amendment By Preventing It From Being Stripped Of Any Real Meaning*

The Warrant Clause of the Fourteenth Amendment provides: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation...." U.S. CONST. amend. IV. The directive that no warrants shall issue unless and until a showing of probable cause is made truly is one of our Constitution's most sacred principles. However, its actual implementation relies on some very basic assumptions.

In *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the petitioner partook in a conversation with local officers after his formal arrest for assault and while awaiting a bail hearing in family court. The brief conversation revolved around a rape, kidnaping and burglary recently committed. After a rather revealing statement by petitioner, which was later mentioned to an officer on the more serious case, the officers jointly submitted affidavits to a local judge in order to obtain a search warrant for petitioner's apartment. After the search of the apartment revealed severely incriminating evidence against petitioner, petitioner moved for suppression of the evidence on the ground that the officers made false statements to the issuing judge and did so in bad faith.

The question that eventually arrived at the Supreme Court yielded an answer that we take for granted today. The issue before the Court was whether "a defendant in a criminal proceeding ever [has] the right, under the Fourth and Fourteenth Amendments, subsequent to the *ex parte* issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant." *Id.* at 155, 98 S.Ct. 2674. The Court held that a defendant is constitutionally entitled to a hearing at his request if he can make a substantial showing that a false statement was made intentionally or with reckless disregard for the truth, and if the allegedly false statement is necessary to the finding of probable cause. *Id.* at 155–56, 98 S.Ct. 2674.

In rejecting the government's request for a flat non-impeachment rule, the Court relied upon the Warrant Clause and a critical assumption upon which the Clause rests:

[A] flat ban on impeachment of veracity could denude the probable-cause requirement of all real meaning. The requirement that a warrant not issue "but upon probable cause, supported by Oath or affirmation," would be reduced to a nullity if a police officer was able to use deliberately falsified allegations to demonstrate probable cause, and, having misled the magistrate, then was able to

32. It should be noted that in an April 1, 1997 *in camera* proceeding before Judge Alarcon and outside the presence of then-defense counsel, Deputy D.A. Jason Lustig and LAPD Detective Johnny Sanchez argued that Plaintiffs (and then-Defendants) Gaxiola and Gastelum were not entitled to discovery of either the existence or substance of the wiretaps, due to the invocation of the official governmental privilege of California Evidence Code § 1040. Judge Alarcon's decision to order discovery stated: "as the Court sees it, since 1054 and the [wiretap] statements of the defendant are so basic to a defendant's defense of a case *and also as notice as to what the case* *involves,* that just nondisclosure would deprive the defendant of his due process rights." DeMassa Decl., Ex. 15 at 189 (emphasis added). While the Court today rests its decision more on the Fourth Amendment than on due process, *but see infra* note 36, the Court finds significance in Judge Alarcon's conclusion that the then-defendants were constitutionally entitled to discover the existence and content of the wiretap: "I have probably spoken, as I can by the rules of ethics, possibly to a dozen judges in this building with extensive experience. They are unanimous that this has to be turned over." *See* DeMassa Decl., Ex. 15 at 194.

remain confident that the ploy was worthwhile.

*Id.* at 168, 98 S.Ct. 2674. Thus, if the probable cause requirement is to carry any real weight, defendants must have the right to challenge both the sufficiency of the affidavit (i.e., whether the statements, assuming their truth, actually establish probable cause), *id.* at 171, 98 S.Ct. 2674, and the integrity of the affidavit (i.e., whether the statements were made honestly and in good faith, or at least without reckless disregard for the truth), *id.*, upon a proper showing. An affidavit and resulting warrant that are immune to attack would strip the probable cause requirement of any real meaning.

The wiretapping "hand off" procedure does just this. By creating so-called "independent" probable cause after the "hand off," the authorities are able to conceal the existence of the wiretap from criminal defendants. The Court cannot imagine a more effortless nullification of the probable cause requirement than a concealment of the existence of the affidavit, the wiretapping order, and the resulting wiretap. One cannot challenge the integrity of an affidavit that he does not know exists. If a criminal defendant has a constitutional right to challenge the integrity of an affidavit and the legal validity of the resulting warrant upon a showing of proper cause, as *Franks* clearly establishes, then he must also have a constitutional right to know that an affidavit was submitted in the first place. A contrary holding by this Court would not only nullify the probable cause requirement, it would *denude the Franks principle of all real meaning.*

The most basic clause in the Fourth Amendment, that is, the right to be free from unreasonable searches and seizures, would also be denuded of all real meaning if governmental authorities are permitted to perform a search that triggers Fourth Amendment scrutiny, yet are also permitted to conceal the existence of the search. Just as the integrity of the probable cause requirement rests on the assumption that the accused has a right to challenge whether probable cause was established, the integrity of the unreasonable search and seizure prohibition rests on the assumption that the accused has a right to challenge whether a search was reasonable. Once again, one can hardly challenge the reasonableness of a search that she does not know exists. If an accused cannot challenge the reasonableness of a search, which she certainly cannot do so long as she is ignorant of its existence, the prohibition against unreasonable searches and seizures becomes an empty directive stripped of its substance.

The "hand off" procedure could easily be performed after a typical physical search of a person's home. Imagine that after an owner departs from his home and goes to work for the day, an investigative unit enters the house and performs an extensive and intricate search,[33] which reveals not only large quantities of drugs, but specific evidence of an upcoming deal (whether it be a self-reminder note to "meet John at 24th and Lewis at Friday at 10:00 pm with 24 kgs" or a voicemail from John portraying the same information). Rather than risking the invalidation of the present search at the suppression hearing (whether such concern be due to the search's patented illegality, the questionable integrity of the underlying affidavit, or just sheer neuroticism), *see* next ¶ *infra,* the authorities instead decide to "hand off" the information of Friday night's transaction to a different unit or precinct, with

---

**33.** Whether the search is legal or illegal, for the present purposes, is a moot question. *See* the three scenarios, *infra.*

only the specific instructions of when and where to be and the suggestion to "investigate" (i.e., obtain so-called "independent" probable cause and later make an arrest based upon the "independent" probable cause). The technique works perfectly, as the owner is soon thereafter arrested and convicted of possession of narcotics with intent to distribute, without ever being told of the existence of the original search. While the instant hypothetical does not purport to be an exact analogue of the wiretap "hand off" procedure at issue,[34] it does purport to isolate and flag the danger of the "hand off" maneuver.

It should be clarified that this hypothetical encompasses each of the following distinguishable scenarios: (1) a patently illegal original search, such as one that lacks a warrant, probable cause and any exigent circumstances; (2) an original search that is pursuant to a judicially-acquired search warrant, which may or may not be invalidated if challenged, due to the questionable integrity of the underlying affidavit; and (3) an original search that is very likely legal but, nonetheless, has left the authorities worrying that it might be invalidated, at the cost of essential evidence. While each of the three scenarios differs in the likelihood that the search will be invalidated *without the occurrence of a "hand off,"* the three scenarios are identical with respect to the likelihood that the search will be invalidated *with the occurrence of a "hand off."* Indeed, all three of these searches (and any imaginable search occurring without the knowledge of the accused) becomes entirely insulated from constitutional attack as a sole result of the "hand off," since the "hand off" prevents the accused from ever learning of the existence of the search (and, thus, from challenging its legality). Therefore, the "hand off" maneuver, in a blink of an eye, is able to transform any search, whether patently illegal, potentially illegal, or clearly legal, into a search that is beyond constitutional review. Therein lies its ultimate danger.

The Court can say little, at this point, other than the Fourth Amendment's requirement of probable cause and prohibition against unreasonable searches and seizures are stripped of any real meaning if the existence of the search is concealed from the owner and never revealed to him. It therefore seems that the Fourth Amendment's probable cause requirement and unreasonableness prohibition rest upon the assumption that criminal defendants have a right to know that they were searched in the first place.[35, 36] The wire-

**34.** Admittedly, obvious distinctions exist between the two scenarios, such as the object of the search (i.e., the home v. the wire) or the value in concealing the original search for purposes of pending investigations (i.e., revealing the wiretap would undercut many pending investigations, unlike revealing the search of the home). These distinctions, however, have little, if any, effect on the question of whether the "hand off" procedure is constitutional.

**35.** This right to know of a search might be limited to searches where the connection between the search and the evidence used against the defendant at trial is not so attenuated as to be deemed "independent." *See* discussion, *infra*.

**36.** The "hand off" procedure is also potentially problematic under the *Brady* exculpatory evidence doctrine. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"). The *existence* or *occurrence* of a search might qualify as exculpatory evidence under *Brady* if the search itself is illegal and the evidence therein derived is deemed fruit of the poisonous tree. Since a criminal defendant has a right to discover exculpatory evidence, she ought to have the right under *Brady* to discover the *existence* or *occurrence* of a search, if each of the following is true: the search is illegal, the evidence therein derived is tainted, and the evidence is used (not necessarily in a strict sense, *see*

tap "hand off" procedure is explicitly designed to undermine such a right. It therefore cannot stand.

### The Specified Safeguards of the Federal Wiretapping Statute

The Ninth Circuit and nine other circuit courts have held that Title III, i.e., the Federal Wiretapping Statute, 18 U.S.C. § 2510–20, is facially constitutional. *United States v. Turner*, 528 F.2d 143, 158–59 (9th Cir.1975), citing the other nine circuits. Moreover, the Ninth Circuit and each of the others "have all concluded that once those specified safeguards are met, the requirements of the Fourth Amendment are also satisfied; that in enacting Title III Congress was aware of the decisions of the Supreme Court in this area and had complied with the standards there set forth." *Id.* at 159. Turner's constitutional challenge was therefore dismissed, since the authorities accorded to the specified safeguards of Title III and therefore, by logical extension, to the requirements of the Fourth Amendment.

It is thus clear that violations of the specified safeguards of Title III could amount to violations of the Fourth Amendment. In *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977), the Court established that not every failure to comply fully with each and every safeguard in Title III necessarily renders an interception unlawful and suppressible, stating that such a result only ensues if the violated requirement "directly and substantially implement[s] the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *Id.* at

433, 97 S.Ct. 658, citing *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). In *Donovan*, for example, 39 persons were properly identified in the order, however, two of the persons were "inadvertently omitted" from the identity list, thus, violating the identity requirement of the statute. *Id.* at 439, 97 S.Ct. 658. The Court held that such noncompliance was insufficient to justify suppression.

The instant case is quite different. Section 2518(8)(d), which is the notice provision of Title III, requires that inventory notice be served "[w]ithin a reasonable time but not later than ninety days" after the termination of the last extension, to "persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice." 18 U.S.C. § 2518(8)(d). Defendants have not made "inadvertent omissions" or occasional blunders in complying with this notice requirement; rather, they have developed a systematic procedure whose express purpose is to conceal notice of the wiretap and whose uncontroverted effect is the continuous "direct and substantial" violation of the notice requirement. County Defendant Garcetti issued a June 1, 1998 press release after receiving a Superior Court Order to provide notice to defendants and state prisoners whose lines were tapped, which read: "Since 1993, our office has filed 85 cases in which wiretap surveillance techniques were utilized...The defendants in 58 cases were provided with *no information* concerning the wiretap surveillance while their cases were pending." *See* Compl., Ex. 22 (emphasis added). The

---

discussion of the notion of "independence," *infra*) to inculpate defendant. If each of the three elements are met, the *existence* of the search seems to qualify as evidence "favorable to an accused" (i.e., exculpatory), since the discovery of such evidence allows the ac-

cused to suppress inculpatory evidence that would otherwise be admitted and used to convict her. Once again, an accused can hardly request discovery of such potentially exculpatory evidence if its very existence is concealed.

Court finds that the wiretapping "hand off" procedure, rather deliberately and openly, conflicts with Title III's notice safeguard. In light of Title III's inextricable intertwinement with the Fourth Amendment,[37] see *Turner*, the wiretapping "hand off" procedure cannot withstand constitutional scrutiny.

### The Notion of "Independence"

It also appears that a proper understanding of the notion of "independence" promotes a determination that the wiretapping "hand off" procedure is unconstitutional. The Court is convinced that Defendants are misguided in believing that the "hand off" allows the receiving unit to obtain "independent" probable cause through their post-"hand off" investigation. The Court, instead, believes that the probable cause resulting from the "hand off" can only be described as paradigmatically "dependent."

The issue in this section is not whether evidence used to convict a defendant is tainted by an original unlawful search, as in most questions of suppression,[38] but whether the evidence that resulted from the post-"hand off" investigation and that was used to convict a defendant is supported by "independent" probable cause.[39] If the probable cause resulting from the secondary investigation is truly "independent," as Defendants believe that it is, then the Plaintiffs' lack of knowledge of the original search would be harmless, since the "independence" of the secondary probable cause would render the original search (i.e., the wiretap) inapplicable to and uninfluential of the prosecution. In other words, if the probable cause derived from the post-"hand off" investigation is "independent," then Defendants might be able to conceal the existence of the search and still not offend the Constitution.

█ As a matter of law, the Court finds that the "hand off" does not create sufficient attenuation between the pre-"hand off" wiretap and the post-"hand off" evidence such that the receiving unit can establish "independent" probable cause.[40]

37. In deciding to remand to the District Court for more specific factual findings relating to the notice requirement under § 2518(8)(d), with respect to unnamed but overheard wiretap defendants, the Ninth Circuit, in *United States v. Chun*, 503 F.2d 533, 537 (9th Cir. 1974), stated that:

the unnamed but overheard are also entitled to Fourth Amendment protection. Specifically, we believe that when the government intends to use the contents of an interception *or evidence derived therefrom*, to obtain an indictment against an unnamed but overheard individual, such individual must be given notice promptly after the decision to obtain an indictment has been made.

(Emphasis added)(the "evidence derived therefrom" standard, although couched in slightly different terms, is analyzed *infra* in the section, "The Notion of Independence"). Under the *Chun* reasoning, there appears to be little doubt that the "hand off" procedure's flagrant disregard of the notice requirement offends the Constitution.

38. The "independent source" doctrine, *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), *Murray v. United States*, 487 U.S. 533, 541, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), and the "inevitable discovery" doctrine, *see Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), both assume the existence of an initially illegal search. They therefore gauge whether the connection between the illegal search and the evidence used to inculpate the accused is so attenuated as to dissipate the taint of the original illegal search. *See Id.; Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

39. For purposes of isolating the constitutional permissibility of the wiretap "hand off" procedure, the Court *assumes arguendo* the legality of the initial wiretap.

40. Defendants seem to believe that the "hand off" creates a hermetic seal between the wiretap and the post-"hand off" investigation. The Court disagrees, believing instead that the

In fact, the Court finds that the "hand off" epitomizes the notion of dependence. Evidence is gathered through a search by one investigative unit and then delivered to another unit, who is awarded precise information essentially guaranteed to lead to criminal activity, while being deprived of only the method by which the information was originally acquired.[41] The Court is not clear on how such a dependent, spoon-fed process can conceivably generate "independent" probable cause, simply because the secondary investigation occurs outside the presence of the initial unit. Because the wiretapping "hand off" procedure fails to generate "independent" probable cause, the Court finds that the pre-"hand off" wiretap and the post-"hand off" investigation are just two stages of one continuous investigation that leads to the convictions of the criminally accused. Concealing the existence of the entire first stage, which consists of the affidavit, the wiretap order, and the wiretap, itself (and out of which the initial awareness of the instant Plaintiffs' criminal conduct arose), is patently unacceptable.[42]

The Court is convinced that preserving the substance of the Fourth Amendment, respecting the constitutional principles built into the Federal Wiretapping Statute, and applying a proper understanding of the notion of "independence" all demand holding the wiretapping "hand off" procedure per se unconstitutional.[43] In *Brady v. Maryland*, the United States Supreme Court stated: "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87, 83 S.Ct. 1194. The wiretapping "hand off" procedure flies in the face of this essential principle. It cannot stand.

(ii) The Resolution of the § 1983 Claims

■■■■ Because the Court holds the wiretapping "hand off" procedure *per se* unconstitutional, the Court denies Defendants' motion, and grants Plaintiffs' motion, for summary judgment on Plaintiffs' § 1983 declaratory judgment claim.[44]

"hand off" creates an iron chain that inextricably links the two phases together.

41. Although the receiving unit is deliberately not told that the source of the information is a wiretap (in order to allow the members of the receiving unit to testify at trail to their investigation without referencing the wiretap and without falsely testifying), cross-examination of certain Defendants reveals that a "wink-nod" communication often exists as the "hand off" occurs, allowing the receiving unit to draw the obvious inference that the specific evidence was acquired through a wiretap. *See* Testimony of Detective Hodges in DeMassa Decl., Ex. 3 at 71–72 (illustrating that the receiving unit generally knows that the source of the specified information is a wiretap, whose existence now must be concealed).

42. Defendants also argue that the official privilege pursuant to California Evidence Code § 1040 permitted them to conceal the existence and contents of the wiretap. Firstly, an asserted state evidentiary privilege is not a viable excuse for violating federal constitutional rights. Secondly, as Judge Alarcon stated in an April 1, 1997 *in camera* hearing, *See* DeMassa Suppl. Decl., Ex. 15 at 189, § 1054.1 requires not only the disclosure of "any exculpatory evidence," but also the disclosure of "statements of all defendants." Judge Alarcon was convinced, and rightfully so in the Court's opinion, that Defendants' interpretation represents "a fundamental misreading of 1054." *Id.* at 191. Section 1040's official evidentiary privilege does not cover wiretapping conversations any more than it covers exculpatory evidence. *See Id.* at 189. Defendants' argument that § 1040 excuses the "hand off" procedure is, therefore, misguided.

43. While the instant facts involve the use of the "hand off" procedure in the context of a wiretap search, there is no reason why a "hand off" would be any less violative of the Constitution in a different context, such as in the realm of confidential informants, undercover officers, or physical searches.

44. A *Heck* defense is inapplicable to Plaintiffs' § 1983 declaratory relief claim. In *Heck*, the

Conversely, the Court grants Defendants' motion for summary judgment with respect to Plaintiffs' § 1983 claim for monetary damages, as the Defendants are undoubtedly entitled to qualified immunity on this claim, since today's constitutional holding obviously was not "clearly established" at the time of the activity. *See* Qualified Immunity Discussion *supra,* Part II.A.2.a.ii; *Saucier; Act Up!/Portland.*[45, 46]

(B) State Law Claims

(1) The Applicability of the Various Claims

 Plaintiffs assert various state law claims for specific violations of the California Wiretapping Statute. Cal.Penal Code § 629.50 et seq. Plaintiffs assert claims for failure to identify, pursuant to section 629.50; failure to minimize, pursuant to section 629.58; and failure to provide no-

Supreme Court repeated, time and time again, that the § 1983 claims to be barred by the new doctrine were specifically restricted to claims for money damages. *See Heck,* 512 U.S. at 480, 114 S.Ct. 2364 ("the question before us was whether *money damages* premised on an unlawful conviction could be pursued under § 1983")(emphasis added); *Id.* at 486–87, 114 S.Ct. 2364 ("[w]e hold that, in order to recover *damages* for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove...")(emphasis added). In *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997), the Court's holding had the effect of barring Plaintiff from asserting a § 1983 claim for both monetary and declaratory relief; *Edwards,* however, is distinguishable from the instant case. The issue before the Court in *Edwards* was not whether *Heck* should be extended to also bar § 1983 claims for declarations, but whether the specific procedural defects alleged by the Plaintiff to have occurred during his penitentiary hearing for in-prison infractions would, if established, necessarily imply the deprivation of his good-time credits. *Id.* at 645–46, 117 S.Ct. 1584. The granting of declaratory relief but not money damages in that case would have been useless, since a declaration of the officer's corruptive behavior toward plaintiff during the particular hearing in question would be a toothless bite in the absence of accompanying money damages. The instant case is much broader and involves a deeply-imbedded and widely-used governmental procedure whose declared unconstitutionality will have severely sharp teeth, even without money damages being awarded to the particular Plaintiffs who actually brought the critical issue to the Courts. *Heck's* unequivocal restriction should be observed.

45. As a result, Plaintiffs' § 1983 claims for municipal liability for failure to instruct, supervise, control and discipline are expunged, as the "hand off" procedure does not amount to a governmental custom or policy which reflected a deliberate indifference to the constitutional rights of Plaintiffs, since Defendants genuinely believed that the "hand off" procedure was constitutionally permissible and, thus, were not deliberately indifferent to Plaintiffs' constitutional rights. *See Monell v. New York City Dept. Of Soc. Serv.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)(holding that municipalities cannot be held liable under a theory of respondeat superior, but can be liable only when a constitutional deprivation arise from a governmental custom); *City of Canton v. Harris,* 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)(holding that in order to establish municipal liability, a plaintiff must show that a policy existed which reflected deliberate indifference to their constitutional rights).

46. Counsel for Plaintiffs at the October 1, 2003 Hearing before this Court spoke of City Defendant Marco's "arrogance" and "braggadociousness" [sic] as Marco testified on cross-examination to the logistics of the "hand off" procedure at the January 30, 1998 criminal trial of now-Plaintiffs Gastelum and Gaxiola. *See* Transcript at 12. However arrogant Marco may have been in describing the glory and invincibility of the "hand off" procedure, his alleged arrogance does not affect the qualified immunity analysis, since arrogance is not an adequate substitute for "clearly established law;" nor does it affect the municipal liability analysis, since his alleged arrogance was clearly accompanied by a genuine belief that the procedure was constitutionally permissible, and such a belief is plainly incompatible with a "deliberate indifference" to the constitutional rights of Plaintiffs.

tice, pursuant to section 629.68 (inventory notice to named and known parties) and section 629.70 (notice to criminal defendants). Plaintiffs seek to recover for the above violations under § 629.86, which expressly permits a private right of action for damages if any section of the chapter is violated. The record undoubtedly reveals a genuine dispute of material fact that is ripe for a factual finding by a jury.

■■■ Defendants at the October 1, 2003 Hearing made arguments and requested clarification on the applicability of these various provisions to the different Defendants. The Court shall now clarify. Section 629.50's duty can potentially apply to both the County and City Defendants, since the obligation to identify falls on the shoulders of "the applicant." Section 629.58's duty to minimize can only be attributable to the City Defendants, since only the City Defendants were involved in "execut[ing]" and "conduct[ing]" the wiretap order.

■■■ While the face of section 629.68 places the duty to provide inventory notice expressly on the judge, the judicial decision to provide inventory notice is contingent on the good faith and full disclosure of the applicant, since the applicant is the source of the judge's information. Accordingly, an applicant for an order or extension falls within the province of section 629.68, although only to the extent that section 629.68 imposes a duty of good faith and full disclosure on the applicant. *See* analogous reasoning in the federal context, *Chun*, 503 F.2d at 540 (9th Cir.1974)(holding that the duty to provide inventory notice, which is imposed on the judge by the express language of the statute, was nonetheless violated by the applicants because "the judge issuing the wiretap order would have required them to be served with inventory notice pursuant to § 2518(8)(d) had he known of their existence and capacities; and his lack of

knowledge came about because of the government's failure to disclose that information to him"). Because section 629.68 generates an ancillary duty on the part of applicants, it is potentially enforcible against both the County and City Defendants.

■■■ Section 629.70, which creates a specific duty to notify criminal defendants who were identified as a result of an interception, provides in pertinent part:

[a] defendant shall be notified that he or she was identified as the result of an interception that was obtained pursuant to this chapter. The notice shall be provided *prior to the entry of a plea of guilty* or nolo contendere, or *at least 10 days prior to any trial,* hearing, or proceeding in the case other than an arraignment or grand jury proceeding.

(Emphasis added). Unlike the inventory notice provision of section 629.68, which places the notification obligation expressly on the judge, section 629.70 simply states that a defendant "shall be notified...." This provision can only fairly be enforced against the County Defendants, as it arises during the course of prosecution, which is well after the law enforcement's role in the wiretap fades. While it is inarguable that this section was violated by County Defendants (the notice ordered by Judge Alarcon was received by the Portillo Plaintiffs well after they entered their guilty plea, and by Gaxiola and Gastelum long after they were tried and convicted), there remains a genuine issue of material fact as to which of the County Defendants is responsible.

(2) Defendants' Entitlement to Immunity

■■■ Defendants are not entitled to absolute immunity under section 629.86, at this time, due to Defendants' failure to establish the requisite "good faith."[47] The Court has noted several times that Defendants' violation of Plaintiffs' Fourth

---

**47.** Section 629.86 provides, in part: "[a] good faith reliance on a court order is a complete

Amendment rights through the use of the "hand off" procedure appeared to result from a genuine belief that the procedure was constitutional. *See supra.* Defendants' general and broad "good faith" belief in the constitutionality of the "hand off" procedure is distinguishable from whether or not they exercised "good faith reliance on a court order" for purposes of Plaintiffs' state law claims. Section 629.86's "good faith" immunity is *not* a broad "good faith" defense, but a narrow defense that is triggered only when a party exercises "good faith" *in relying on a court order.*

For example, such a defense would immunize the telephone companies that are subjected to a wiretap order (such as the companies involved herein, i.e., General Telephone Company, Air Touch Cellular, and LA Cellular). *See* Aff. of Detective Keith Lewis, City Defendants' Request For Judicial Notice, Ex. 9 at 61. Section 629.86 immunity might also insulate an officer whose sole involvement in a wiretap is the actual execution of the wiretap order after a command from a superior officer. Such examples of "good faith reliance" fall within the scope of section 629.86 immunity. Plaintiffs have shown that Defendants' involvement in the acquisition and execution of the wiretap orders constituted active and assertive conduct, not mere passive reliance. Additionally, Plaintiffs contend and have made a sufficient showing that Defendants violated various specific provisions of the wiretap order. Defendants therefore fall outside of section 629.86's realm of protection.

██ Nor are Defendants entitled to section 821.6 immunity.[48] It is well-estab-

lished that section 821.6 immunity is not absolute. *See Sullivan v. County of Los Angeles,* 12 Cal.3d 710, 117 Cal.Rptr. 241, 527 P.2d 865 (1974)(holding that section 821.6 immunity does not extend to false imprisonment, despite the section's seemingly absolute language). Moreover, section 821.6 immunity does not apply to a given sphere of conduct if a particular statute generates governmental liability within that sphere. *See Amylou v. County of Riverside,* 28 Cal.App.4th 1205, 1213, 34 Cal.Rptr.2d 319 (1994)("the rule in this state is that, *unless otherwise provided by statute,* '[a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person' ")(emphasis added). Section 829.86 does just this. The California Wiretapping Statute provides that wiretapping must meet strict requirements, many of which apply only to governmental wiretaps, as opposed to simple peeping done by members of the citizenry. Section 829.86 makes clear that individuals have a private right of action for violations of the statute. Defendants' interpretation of section 821.6's generalized immunity would render section 829.86's particularized and express right of private action nearly meaningless. Indeed, section 821.6 has never immunized officials from liability for violations of section 829.86. Defendants' motion for summary judgment on Plaintiffs' state law claims under California Penal Code section 629 is accordingly denied.

### CONCLUSION

The Court GRANTS, in part, and DENIES, in part, Defendants' Motions for Summary Judgment. The Court grants

---

defense to any civil or criminal action brought under this chapter..."

**48.** Section 821.6 provides: "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or ad-

ministrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Section 815.2 immunizes the public entity, itself, whenever section 821.6 immunizes the particular employee.

Defendants' Motion for Summary Judgment with respect to Plaintiffs' § 1983 claim for judicial deception, under the principle of *Heck.* The Court denies Defendants' Motion for Summary Judgment and, instead, grants Plaintiffs' Motion for Summary Judgment with respect to Plaintiffs' § 1983 declaratory judgment claim for the per se unconstitutionality of the wiretapping "hand off" procedure. The Court grants Defendants' Motion for Summary Judgment with respect to Plaintiffs' § 1983 money damages claim for the per se unconstitutionality of the wiretapping "hand off" procedure, due to Defendants' entitlement to qualified immunity.

Finally, the Court denies Defendants' Motion for Summary Judgment with respect to Plaintiffs' various state law claims under California Penal Code § 629, due to the existence of a genuine dispute of material fact on the issues of identification, minimization, and notice. It should be noted, however, that Plaintiff Jack Whitaker's state law claims have already been dismissed [49] because Whitaker failed to comply with the presentation requirement of the California Torts Claims Act. *See* Ct. Order entered on April 13, 2000.

■ Gaxiola and Gastelum, however, are permitted to go to trial on their state law claims against both the County and the City Defendants. County Defendants' argument that Gaxiola and Gastelum are not proper Plaintiffs against them, due to these Plaintiffs' belated and improper entry into the lawsuit, fails. Plaintiffs Gaxiola and Gastelum were added to this lawsuit in the First Amended Complaint, dated January 11th, 2000. Federal Rule of Civil Procedure 21 makes clear that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative *at any stage of the action* and on such terms as are just." Fed.R.Civ.P. 21 (Emphasis added). Because the Court finds that rectifying the initial non-joinder of these two Plaintiffs would be just and would not prejudice the County Defendants, *see* DeMassa's non-prejudice argument, Transcript at 6, the belated addition of Gaxiola and Gastelum is permissible under Rule 21. *See Sable Comm's of California v. Pacific Tel. & Tel. Co.,* 890 F.2d 184, 191 n. 13 (9th Cir.1989)(stating that prejudice to the non-moving party would not be "just" and, thus, would defeat a Rule 21 motion).

■ Alternatively, the belated addition would be *compulsory,* or outside the discretion of this Court, under the first prong of Federal Rule of Civil Procedure 15(a), since Plaintiffs (i.e., the Portillo Plaintiffs) were entitled to amend their complaint "once as a matter of course at any time before a responsive pleading is served...." As of the January 11, 2000, filing of the First Amended Complaint, in which Gaxiola and Gastelum were added, County Defendants had not yet filed an answer, which occurred on March 1, 2002; nor had they filed a motion to dismiss, which occurred on February 16, 2000. Accordingly, the original Plaintiffs were entitled to add Gaxiola and Gastelum "as a matter of course" under Rule 15(a), without obtaining either "leave of court" or their opponents' "written consent." [50]

---

**49.** Incidentally, Whitaker's § 1983 money damages claim for the per se unconstitutionality of the wiretapping "hand off" procedure would be denied, even if it were not barred by Defendants' entitlement to qualified immunity, due to the fact that Whitaker was at no time prosecuted. *See* Ct. Order entered April 13, 2000 (unnamed and overheard individuals who are not subsequently arrested or charged with the commission of a crime, as a result of the wiretap surveillance, do not have a *constitutional* right to notice of the wiretap).

**50.** It should be noted that the "relation back" doctrine of Federal Rule of Civil Procedure 15(c) is inapplicable to the instant issue because there exists no statute of limitations dispute.

Lastly, the Portillo Plaintiffs are entitled to go to trial on their state law claims against both the County and the City Defendants.

IT IS SO ORDERED.